Cheshire
No. 89-127

*In re* CERTAIN SCHOLARSHIP FUNDS

May 24, 1990

*Goodnow, Arwe, Ayer, Prigge & Wrigley P.C.*, of Keene (*John D. Wrigley* on the brief and orally), for the School Board of the Union School District of Keene.

*John P. Arnold*, attorney general (*William B. Cullimore*, Director of Charitable Trusts, on the brief and orally), for the State.

BATCHELDER, J.   Frank A. Wright, a resident of Keene, died on October 29, 1929, and within his will, probated November 4, 1929,

was language establishing a charitable scholarship trust requiring that eighty percent of the annual income on the principal:

> "shall be used to provide a college education for some poor and worthy Keene boy who is a scholar in the Keene High School. Said boy is to be recommended by the Principal of the Keene High School and . . . approved by the Board of Education of the Union School District, or its successors . . . ."

Given the generosity of the Wright Scholarship Trust and the resources available to it, the scholarship has generally been awarded every four years. In the last decade, the Wright Scholarship was awarded in 1982, 1986, and 1988.

Maurice A. Alger, also a resident of Keene, died on February 28, 1970, and within Mr. Alger's will, probated March 6, 1970, was similar language establishing a charitable scholarship trust requiring that thirty percent of the annual income on the principal:

> "shall be used to provide tuition for one year for some worthy protestant boy who is a scholar at the Keene High School, to attend some college in good standing. Said boy is to be recommended by the principal of the Keene High School and . . . approved by the Board of Education of the Union School District or its successors . . . ."

The Alger Scholarship has been awarded in the amount of $3,400 annually for five out of the last six years.

From the record and the agreed statement of facts, there is no indication that a female student has ever applied for a scholarship under either of the trusts. Likewise, because there is no independent information available to the high school principal to verify the religious affiliation of the applicants, it is unclear whether any non-Protestant students have applied for, or have been awarded, a scholarship under the Alger trust. The principal of the Keene High School assumes that the applicants have read the requirements of the scholarship and have applied according to its terms. Once the students have applied, the school board selects who shall receive the scholarships based upon the recommendation of the principal of Keene High School. The awards are announced during an assembly, and the funds are provided from the trust funds which are held by the City of Keene Trustees of Trust Funds. Thus, the facts of this case reveal that there are three different instances in which public officials are involved in the administration of these discriminatory trusts. We

note in passing that there currently are, and most likely will continue to be, students at the Keene High School who meet both the Wright and Alger Scholarship requirements.

On October 8, 1987, the School Board of the Union School District of Keene (School Board), fearing that its actions in the administration of these religion and gender-based discriminatory trusts may be violative of constitutional guarantees of equal protection, filed a petition in equity seeking the removal of the discriminatory provisions. At trial, the Superior Court (*Hollman*, J.) reformed the language of the trusts, utilizing its *cy pres* powers to replace the terms "boy" and "protestant boy" with the term "student." RSA 498:4-a. In particular, the court held that it was unconstitutional "State action" for the School Board, as an arm of the State, to participate in the administration of religion and gender-based discriminatory trusts. Furthermore, the court found that it would be exercising constitutionally impermissible "State action" were it to employ its equitable powers of deviation, as urged by the Director of Charitable Trusts, to reform the trusts by striking the language requiring the participation of public officials and appointing private persons to act in their absence. In arriving at a remedy, the court reasoned that it was appropriate to use its *cy pres* powers to preserve the primary intent of the testators, which was to aid deserving students at Keene High School in their pursuit of a college education. For the following reasons, we affirm.

On appeal the defendant, the Attorney General, Director of Charitable Trusts, presents the following two questions: (1) whether the actions of the Union School District of Keene, in participating in the administration of religion and gender-based discriminatory trusts, may be viewed as "State action" within the ambit of part I, article 2 of the New Hampshire Constitution and the equal protection clause of the fourteenth amendment to the United States Constitution and, if so, (2) whether the court may employ its equitable powers of deviation to reform the trust by striking the language requiring the participation of public officials and appointing private persons to act in their absence, thereby terminating any State participation. In affirming the decision of the trial court, we must answer the first question in the affirmative and the second in the negative.

Since we have been presented with both State and federal constitutional claims, we will address the State constitutional claim first. *State v. Ball*, 124 N.H. 226, 231, 471 A.2d 347, 350 (1983). To the extent that we look to the United States Supreme Court for guidance

in approaching these difficult issues, we borrow only the analytical framework of the Court's decisions in our interpretation of part I, article 2 of the New Hampshire Constitution, and as such, we are not "tied to present or future federal pronouncements on the issue." *State v. Bradberry*, 129 N.H. 68, 73, 522 A.2d 1380, 1382 (1986). Part I, article 2 of the New Hampshire Constitution as amended provides as follows:

> "[Art.] 2d. [Natural Rights.] All men have certain natural, essential, and inherent rights—among which are, the enjoying and defending life and liberty; acquiring, possessing, and protecting, property; and, in a word, of seeking and obtaining happiness. Equality of rights under the law shall not be denied or abridged by this state on account of race, creed, color, sex or national origin."

The first step in our inquiry requires us to determine whether there is the necessary "State action" present to implicate the provisions of our constitution. As the United States Supreme Court in *Shelley v. Kraemer*, 334 U.S. 1, 13 (1948), stated:

> "Since the decision of this Court in the *Civil Rights Cases* . . . the principle has become firmly embedded in our constitutional law that the action inhibited by the first section of the Fourteenth Amendment is only such action as may fairly be said to be that of the States. That Amendment erects no shield against merely private conduct, however discriminatory or wrongful."

As previously suggested, there are three levels of potential "State action" implicated by this appeal: (1) screening of applicants by the principal of the Keene High School, (2) the participation of the School Board in the selection of students to receive the scholarships, and (3) the role of the City of Keene Trustees of Trust Funds in the administration of the trust funds.

■ The determination of what acts may properly be considered "State action" within the meaning of part I, article 2 of the New Hampshire Constitution must be established on a case-by-case basis. *See Burton v. Wilmington Pkg. Auth.*, 365 U.S. 715, 722 (1961). The development of a formula to determine whether or not "State action" is present has been labeled an "impossible task." *Id.* "Only by sifting facts and weighing circumstances can the nonobvious involvement of the State in private conduct be attributed its true significance." *Id.*

■ In *Pennsylvania v. Board of Trusts*, 353 U.S. 230 (1957), the United States Supreme Court held that the administration of a discriminatory trust by an agency of the Commonwealth of Pennsylvania, benefitting poor male white orphans, was constitutionally impermissible. Similarly, of those cases in other jurisdictions that have addressed this issue, the majority have held that the administration of discriminatory trusts by agencies of the State is "State action" subject to the constitutional mandates of equal protection. *See In re Crichfield Trust*, 177 N.J. Super. 258, 261, 426 A.2d 88, 89 (1980); *Trammell v. Elliott*, 230 Ga. 841, 845, 199 S.E.2d 194, 197 (1973); *Bank of Delaware v. Buckson*, 255 A.2d 710, 713–14 (Del. Ch. 1969). Accordingly, we hold that the participation by the principal, School Board, and the City of Keene Trustees of Trust Funds, as agents of the State, in the administration of these discriminatory trusts amounts to "State action" within the ambit of part I, article 2 of the New Hampshire Constitution. Since the State's participation in the administration of either the Alger or Wright Scholarship trust cannot even withstand the lowest level of judicial scrutiny, we need not determine what level of review should be employed in cases of gender and religious discrimination that are expressly forbidden by the most recent amendment to part I, article 2 of the New Hampshire Constitution. *Cf. Belkner v. Preston*, 115 N.H. 15, 18, 332 A.2d 168, 170–71 (1975) (part I, article 2 was amended in 1974 providing that equality of rights under the law shall not be denied or abridged on the basis of, *inter alia*, creed or gender). Having concluded that the State's participation in the beneficiary selection process, management, and miscellaneous administration of these trusts is constitutionally impermissible, we now turn to the issue of whether the trial court erred in employing the *cy pres* doctrine to reform these trusts, replacing the terms "boy" and "protestant boy" with the term "student."

■ The trial court found, based upon the facts before it, that there was no indication that Mr. Wright or Mr. Alger would not have responded to the changes in attitudes experienced by society since the creation of these trusts. Furthermore, the court could not find, from language of the wills, any particular discriminatory intent. Thus, the trial court concluded that the primary intent of both testators was not to discriminate against women and non-Protestants, but to assist the students at Keene High School in their pursuit of higher education. After finding a general intention to devote the property to a charitable purpose, and in the absence of a gift-over provision, the

trial court invoked the doctrine of *cy pres* to reform the terms of the trusts. *See* IVA SCOTT, THE LAW OF TRUSTS § 395, at 384 (4th ed. 1989). As we have stated on numerous occasions, we will not disturb the trial court's findings of fact or rulings of law unless they are unsupported by the evidence or erroneous as a matter of law. *See Desmarais v. Joy Mfg. Co.*, 130 N.H. 299, 303, 538 A.2d 1218, 1220 (1988).

In New Hampshire, the application of the *cy pres* doctrine is controlled by RSA 498:4-a, which provides in pertinent part:

> "498:4-a. Cy Pres Doctrine. If property is or has been given in trust to be applied to a charitable purpose, and said purpose or its application is or becomes impossible or impracticable or *illegal or obsolete or ineffective or prejudicial to the public interest to carry out*, the trust will not fail. Upon petition by the trustee or trustees or the attorney general, the superior court may direct the application of the property to some charitable purpose which is useful to the community, and which charitable purpose fulfills as nearly as possible the general charitable intent of the settlor or testator. . . ."

(Emphasis added.) This statute is of great significance because it contains language allowing the court to apply the doctrine of *cy pres* where the purpose or application of a charitable trust becomes "illegal or obsolete or ineffective or prejudicial to the public interest to carry out." RSA 498:4-a. Concern for the public's interest may be found throughout the historical development of the *cy pres* doctrine, *see* DiClerico, *Cy Pres; A Proposal For Change*, 47 B.U.L. REV. 153, 154 (1967), and the presence of this language distinguishes the application of *cy pres* in this case from other cases where the courts have been reluctant to do so. *See Matter of Estate of Wilson*, 465 N.Y.S.2d 900, 905, 452 N.E.2d 1228, 1233 (1983) (charitable intent must be rendered impossible or impracticable, and so long as there were available beneficiaries that qualified under the testator's specific intent there was no impossibility).

Part I, article 2 of the New Hampshire Constitution forbids the State to discriminate on the basis of creed and gender. The New Hampshire voters, in ratifying this amendment, have firmly established public policy that demands equal protection for all, regardless of creed or gender. Although the views of society are ever changing, they can hardly be discounted or overlooked when they become the object of a constitutional amendment. The statutory provision requires that, upon finding a trust either illegal or prejudicial to the

public interest, the "charitable purpose" of the trust may be reformed or redirected so as to fulfill the testator's intent as nearly as possible. In accordance with this directive, we hold that the trial court properly invoked the doctrine of *cy pres* to strike the terms "boy" and "protestant boy" and to replace them with the term "student."

Notwithstanding, the defendant argues that the court should employ its equitable powers of deviation to reform the trust, striking the language requiring the involvement of public officials, and replacing it with language designating private persons to carry out the administration of the trusts. We disagree. Our *cy pres* statute, quoted above, directs our courts to reform the illegal purpose, not to preserve it as far as possible by modifying those provisions requiring public administration of the trust. But even if our statute were uncertain on this issue, our review of the two leading cases on this subject would persuade as that the trial court followed the proper course.

The two leading cases that have dealt with this issue are *Commonwealth of Pennsylvania v. Brown*, 392 F.2d 120 (3d Cir.), *cert. denied*, 391 U.S. 921 (1968), and *Matter of Estate of Wilson supra*. In *Commonwealth of Pennsylvania v. Brown*, the United States Court of Appeals for the Third Circuit ruled on the constitutionality of the actions taken by the Orphan's Court in substituting a private trustee for a public trustee to administer a discriminatory trust established by Stephen Girard. The court held that the substitution and selection of trustees by the Commonwealth, in an effort to uphold the discriminatory purposes of the trust, did "significantly encourage and involve the Commonwealth in private discriminations" and was therefore unconstitutional "State action." *Brown*, 392 F.2d at 125 (quoting *Reitman v. Mulkey*, 387 U.S. 369, 381 (1967)). The *Brown* court explained that its holding was not based solely on any momentum created by the State's involvement throughout the institutional life of the trust, *see Evans v. Newton*, 382 U.S. 296 (1966), but was also based upon the obvious consequences of the State's participation in the modification of the trusteeship structure from public to private trustees; *i.e.*, the perpetuation and continuation of discrimination at the Girard College. *Commonwealth of Pennsylvania v. Brown*, 392 F.2d at 125.

In contrast, the New York Court of Appeals in *Matter of Estate of Wilson*, 465 N.Y.S.2d 900, 452 N.E.2d 1228, held that the use of the court's equitable powers to facilitate the continued administration of

discriminatory trusts, replacing the school district as trustee with a private trustee, was not "State action" within the ambit of the fourteenth amendment. *Id.* at 909, 452 N.E.2d at 1237. The *Wilson* court stated:

"It is only when the State itself discriminates, compels another to discriminate, or allows another to assume one of its functions and discriminate that such discrimination will implicate the amendment."

*Id.*

■■ In choosing between these two opposing views, we are necessarily required to choose between the competing values that they represent. Starting from the assumption that a public trust administered through "State action" violates our constitution when it discriminates on grounds of sex or religion, the court must ask whether its first priority is to end the discrimination or to preserve it by substituting a private administrative mechanism that would, if chosen by the testator, have carried no unconstitutional implication. As we said above, we believe that the appropriate source of values for our judgment is the constitution, which forbids the agencies of the State to act in a manner that would preserve the constitutionally impermissible desires of the testator. We therefore reach the same result ordered in *Commonwealth of Pennsylvania v. Brown supra.* Furthermore, we hold that the use of the court's powers to appoint or reappoint a trustee in those cases where the trust involved is, and has been from its inception, a privately administered lawful discriminatory trust, does not rise to the same level of State involvement so as to be considered significant. *See Moose Lodge No. 107 v. Irvis,* 407 U.S. at 163.

Our society permits discrimination in the private sector in recognizing that the nature of human beings is to associate with, and confer benefits upon, other human beings and institutions of their own choosing. Such private decision-making is a part of daily life in any society. However, when the decision-making mechanism, as here, is so entwined with public institutions and government, discrimination becomes the policy statement and product of society itself and cannot stand against the strong and enlightened language of our constitution.

*Affirmed.*

BROCK, C.J., dissented; the others concurred.

BROCK, C.J., dissenting: The mandate of the New Hampshire Constitution that "equality of rights under the law shall not be denied or abridged by this State on account of race, creed, color, sex or national origin" does not vest the State with the unfettered power to determine how a private individual must dispose of property acquired over his or her lifetime. From the earliest days of our country, Americans have rightly believed that they enjoy a legally protected right to choose the objects of their bounty and to bequeath their property by will, as they see fit. Neither our State nor our Federal Constitution requires this court to write a "better" will for a decedent in terms which reflect the breadth of concern and conception characteristic of a public welfare program.

Accordingly, I would not strain, as my colleagues do, to attempt to find an "illegal purpose" within the educational objectives of the Wright and Alger scholarships, which would justify judicial cancellation, through application of *cy pres*, of the term "boy" in the Wright scholarship and "protestant boy" in the Alger scholarship, followed by substitution of some other criterion applicable to all students, so that all might become potential beneficiaries of the testators' largesse. Although the law favors equal opportunity for all persons, dispositional provisions in a will benefiting persons of one sex or religion are neither illegal nor unconstitutional. I am therefore gravely troubled by the portion of this court's opinion which purports to find an "illegal purpose" in the Wright and Alger trusts, tainting their benevolences and warranting application of our *cy pres* statute to modify the educational objectives of both trusts.

The reasoning employed by the majority in reaching their result calls to mind an observation made by Justice Harlan in his dissent in *Evans v. Newton*, 382 U.S. 296, 315 (1966): "This decision, in my opinion, is more the product of human impulses, which I fully share, than of solid constitutional thinking. It is made at the sacrifice of long-established and still wise procedural and substantive constitutional principle." Accordingly, I respectfully dissent from this court's holding.

Although the constitutional guarantees of equal protection apply to the expenditure of taxpayers' money, and State funds cannot be distributed in a manner which prefers one class of deserving persons over other similarly situated individuals, when we see fit to create a foundation out of our own fortunes, we are at perfect liberty to do what we will with our own, and private prerogatives may be projected beyond the grave, uninhibited by constitutional provisions.

The *Civil Rights Cases*, 109 U.S. 3 (1883), "embedded in our constitutional law" the principle that private conduct, however discriminatory, is immune from the prohibitions of the fourteenth amendment. *Shelley v. Kraemer*, 334 U.S. 1, 13 (1948). Thus, there exists a realm of private action, beyond the reach of the constitutional amendment, that permits an individual to dispose of property as he sees fit. *Claflin v. Claflin*, 149 Mass. 19, 23, 20 N.E. 454, 456 (1889). Arbitrary in life, we are not required to be impartial at death, and the desire to enrich one's own kind is a legitimate incentive to philanthropy for the charitably inclined. *Cf. Green v. Connally*, 330 F. Supp. 1150, 1163 (D.D.C.), *aff'd mem. Coit v. Green*, 404 U.S. 997 (1971). Whether or not a court deems itself more competent to establish a purpose which will promote the general welfare of society, such wisdom is out of place when it results in the redirection of a decedent's private life savings to purposes clearly opposed to the testator's expressed and lawful intention.

Because I have a different perception than the majority of how this case should be decided, I begin my discussion by addressing the first issue presented by the parties. The petition in equity that sparked the present litigation was based upon the school board's role as trustee in administering the Wright and Alger trusts. Although the State concedes that the school board is an arm of the government, it has attempted to avoid the label of State action, urging that the school board "selects a recipient not in the exercise of state power, but as a private fiduciary does." In essence, then, the State argues that a government agency is free to discriminate whenever it does so in a fiduciary capacity. It is well settled, however, that when a State agency serves as trustee of a charitable trust which bestows its bounty disparately upon similarly situated persons, administrative compliance with the testator's restrictions for selection of beneficiaries constitutes a level of State participation in private discrimination sufficient to implicate the constitutional guarantees of equal protection. *See Pennsylvania v. Board of Trusts*, 353 U.S. 230, *reh'g denied*, 353 U.S. 989 (1957).

In *Pennsylvania v. Board of Trusts supra*, one of the long line of cases involving Girard College, the United States Supreme Court first interpreted the fourteenth amendment to preclude the State's role as a fiduciary where a city or its agent acts as trustee of a discriminatory testamentary trust. *Id.* at 231. Girard College was a boarding school for orphans, named after its founder, Stephen Girard, who left two million dollars in trust to the City of Philadelphia

with instructions that the city establish an orphanage and admit only "poor male white orphan children" between the ages of six and ten years. *Girard Will Case*, 386 Pa. 548, 551, 127 A.2d 287, 288 (1956). When two black orphans brought an action in the Orphan's Court seeking to compel the trustee board to admit them, the Board asserted a proprietary-fiduciary distinction, claiming that as trustee it acted only in a fiduciary capacity, exercising no State or governmental function or power. Although the fiduciary distinction was accepted by the Orphan's Court, *Girard Estate*, 4 Pa. D & C 2d 671, 696–701 (Phila. County Orphan's Ct. 1955), and the Pennsylvania Supreme Court, *Girard Will Case supra*, the United States Supreme Court unanimously reversed in a summary opinion, holding that the Board was an agency of the State, and that its refusal to admit orphans because of their race was discrimination by the State forbidden under the fourteenth amendment. *Pennsylvania v. Board of Trusts, supra* at 231.

Thus, a settlor may describe a discrete class of individuals to whom educational advantages are to accrue, subject to constitutional difficulties if the trustee is an agent of the State. *See* G. BOGERT, THE LAW OF TRUSTS AND TRUSTEES § 375, at 123–24 (2d ed. rev. 1977). Here, the appointment of municipal officers as trustees, and the participation of the school board in the administration of scholarships which discriminate on the basis of religion and gender, invested both trusts with constitutionally forbidden State action. Consequently, I concur in that part of the majority's opinion which holds that the superior court was correct in ruling that neither the City of Keene nor the school board may continue to administer the trusts, and that reformation is appropriate to preserve the trusts.

However, I disagree with my colleagues' conclusion that the trial court properly reformed the trusts by amending their dispositive provisions through the exercise of *cy pres*. Accordingly, I start my discussion with the premise that no constitutional or statutory provision has ever existed which would prohibit Mr. Wright, Mr. Alger, or any other testator from establishing a charitable trust for the purpose of providing a "poor and worthy boy" or a "worthy protestant boy" with a college scholarship.

Where a donor has diverted his estate from his heirs, devoting it instead to a selected public purpose permitted by law, and that immediate purpose becomes impossible, impractical, or by change of law, illegal, the fund having once vested in charity does not, absent a forfeiture clause or gift-over, revert to the heirs as a resulting trust;

rather, equity directs the court, through the exercise of its *cy pres* powers, to carry out the testator's intention as nearly as possible. *See* RSA 498:4-a. The rule of *"cy pres,"* which means "as near" in Norman French, permits the court to depart from the expressed intention of the founder, when it cannot be fulfilled to the letter, and to redirect the funds to another similar charitable use if the donor has exhibited a charitable impulse that is "general," extending beyond the named object of his bequest. G. BOGERT, THE LAW OF TRUSTS AND TRUSTEES § 431, at 490–502 (2d ed. rev. 1977).

The facts of this case, however, do not show a proper occasion for the application of *cy pres*. While charitable trusts are favorites of equity and are construed as valid where private trusts would fail, courts are not at liberty to exercise their *cy pres* powers when the donor's express purpose can be fully accomplished. *See* C. DE-GRANDPRE, 7 NEW HAMPSHIRE PRACTICE, WILLS, TRUSTS AND GIFTS § 764, at 318 (1976); *Exeter v. Robinson Heirs*, 94 N.H. 463, 466, 55 A.2d 622, 624 (1947). Here, the school board does not suggest that it has been unable to attract sufficient applicants for the Wright and Alger scholarships, or that applicants have failed to meet scholarship qualifications. To the contrary, there are sufficient candidates graduating from Keene High School to exhaust the annual income from each trust. The testators' purposes, as expressed in each will, command neither the impossible nor the illegal, but can be carried out to the fullest extent, and there is no occasion for the application of *cy pres*.

While the incapacity of the school board to serve as trustee defeats an administrative direction of both the Wright and Alger wills, it by no means follows that the dominant and lawful purpose of the scholarships must be nullified. If a settlor creates a trust for an illegal purpose, the trust will fail, but where, as here, an administrative provision in the terms of the trust is illegal, the trust fails only if the provision cannot be deleted without defeating the lawful purpose of the settlor in creating the trust. RESTATEMENT (SECOND) OF TRUSTS § 65 (1959). Thus, a trust dedicated to illegal ends is a proper subject for *cy pres*, whereas a trust dedicated to a lawful purpose, but burdened by prohibited conditions, is susceptible to modification by alteration of the annexed conditions where the conditions are regarded as subordinate details of the testator's larger, lawful design. *See* I A. SCOTT, THE LAW OF TRUSTS §§ 60–62.9, at 277–316 (4th ed. 1987); *Exeter v. Robinson Heirs, supra* at 465–66, 55 A.2d at 624. The educational objectives of the Wright and Alger trusts, however

old-fashioned or illiberal, are legitimate dispositive prerogatives to which equity should give maximum effect. *See* G. BOGERT, THE LAW OF TRUSTS AND TRUSTEES §§ 375, 376, at 121–59 (2d ed. rev. 1977).

Despite the majority's identification of a so-called "illegal purpose" as grounds for reformation under our *cy pres* statute, a charitable trust may lawfully, and consistent with public policy, provide funding or financial assistance that is directly responsive to the needs of particular groups of persons, to the total exclusion of all others. The trust purposes at issue here are not *per se* "illegal or obsolete or ineffective or prejudicial to the public interest" within the meaning of RSA 498:4-a simply because the testators donated their money to a particular class of beneficiaries. By holding as it does today, that private philanthropy may not focus on certain segments of society without violating public policy and triggering our *cy pres* statute, the majority presents us with our first judicial construction of RSA 498:4-a, and simultaneously calls into question the validity of every charitable trust or philanthropic foundation within this State that has focused its benevolence on a select segment of society.

I do not believe that we have the right to extend the constitutional guarantees of equal protection heedlessly to situations never intended by the framers of either our State or Federal Constitution to be covered by the language of those constitutional provisions, and unless a particular construction of RSA 498:4-a can be supported by sound legal reasoning or founded upon applicable precedent, it ought not to be made. *Matter of Johnson*, 93 A.D.2d 1, 23, 460 N.Y.S.2d 932, 946 (Niehoff, J., dissenting), *rev'd Matter of Estate of Wilson*, 59 N.Y.2d 461, 452 N.E.2d 1228 (1983). Surely, it is not the law of New Hampshire that a testator may not, consistent with public policy, bestow the benefit of a charitable gift upon a class of persons of his or her own choosing. It is regrettable that these uncertainties are being introduced into settled law; the court's decision may have effects far beyond the result reached today, for the inability of donors to choose confidently the objects of their own bounty may inhibit the charitable impulse and discourage charitable giving within our State.

While eradication of discrimination is a worthy social policy which ought to be facilitated, courts ought not to attribute to a testator a breadth of social concern and conception for which the will discloses no marked favor, at the expense of benevolences for which the will discloses an express interest of provision. In sum, courts are not free to update a decedent's will in keeping with contemporary notions of

public good, but must concentrate on effectuating the testator's specific intentions. Here, the Director of Charitable Trusts, who represents the interest of the public in upholding the philanthropic objectives of all charitable trusts, has correctly advanced the doctrine of deviation as the appropriate equitable remedy for the administrative impasse encountered by the school board. Proposing that administration by a private trustee would prevent any unconstitutional entanglement between the State and the trusts, while permitting both trusts to operate for the charitable purposes envisaged by their founders, the Director of Charitable Trusts has rightly sought to reform the trusts' means, rather than their ends, through the doctrine of deviation.

Where the dominant objective of a trust remains capable of fulfillment, but its method of accomplishment has been stalled due to a hitch in the administrative machinery, the doctrine of deviation permits a reworking or repair of the administrative mechanism so that the trust purposes may be accomplished effectively. *Jacobs v. Bean,* 99 N.H. 239, 241–42, 108 A.2d 559, 561 (1954). The doctrine of deviation permits changes in the management of all trusts, and in the case of charitable trusts, may be employed to substitute trustees as well as to alter trust conditions. *See* IV-A A. SCOTT, THE LAW OF TRUSTS § 381, at 323–33 (4th ed. 1989). Thus, if an administrative vacancy occurs due to the unsuitability of a particular named trustee, equity permits the court to appoint another, for it is axiomatic that a trust will not fail for want of a trustee. *See French v. Lawrence,* 76 N.H. 234, 235, 81 A. 705, 706 (1911); *Carr v. Corning,* 73 N.H. 362, 366, 62 A. 168, 169 (1905); IV-A A. SCOTT, THE LAW OF TRUSTS § 397, at 398 (4th ed. 1989).

As noted in Bogert on Trusts:

> "The court regards the expression of a charitable trust intent and the indication of a class of beneficiaries as the important factors in creation. The personality of the trustee is not vital. There are many possible trustees available. The court can easily supply a trustee. The important matter is that the benefits of the property in question should be applied toward the described social purpose."

G. BOGERT, THE LAW OF TRUSTS AND TRUSTEES § 328, at 609–10 (2d ed. rev. 1977). Accordingly, equity does not countenance a wholesale invasion of trust purposes for the want of a trustee; rather, it authorizes the court to appoint a trustee who is capable of effectuating the testator's dominant intent.

The inability of the school board to administer the Wright and Alger scholarships does not render impractical or impossible the accomplishment of specific trust purposes, but it impairs, to a minor extent, the testamentary scheme of candidate selection, in that the School Board can no longer participate in the awarding of scholarships, and a private individual or entity must assume responsibility for the selection of recipients. Such a slight departure from dispositive instructions falls within the scope of the well established rule that "[t]he court will direct or permit the trustee to deviate from a term of the trust if owing to circumstances not known to the settlor and not anticipated by him compliance would defeat or substantially impair the accomplishment of the purposes of the trust. . . ." *Jacobs v. Bean, supra* at 241, 108 A.2d at 561; RESTATEMENT (SECOND) OF TRUSTS § 381 (1959); *see* RSA 498:4. Deviation, then, entails only the incidental departure from the prescribed administrative procedures of the trust without varying the end results envisaged by the donor. The frustration of administrative details encountered in both the Wright and Alger trusts presents a classic case for the application of the trust-saving mechanism of deviation, and accordingly, appointment of a successor trustee is the appropriate method of reforming and thereby preserving both trusts.

Regrettably, however, our court has undertaken to reform the Wright and Alger wills by amending their dispositional provisions and naming other persons, not designated as beneficiaries, to share in the testators' estates. Citing to *Commonwealth of Pennsylvania v. Brown*, 392 F.2d 120 (3d Cir.), *cert. denied*, 391 U.S. 921 (1968), the majority states in its opinion that the trial court may exercise its equitable powers, if at all, to delete the eligibility criteria of both trusts, because judicial appointment of a successor trustee would implicate the court in a testamentary scheme of discrimination. According to the majority, the judicial act of appointing a substitute trustee would amount to unconstitutional State action.

Although the complex legal concept known as judicial State action is "a concept whose application is a source of considerable mystery even to legal scholars," *Matter of Johnson*, 93 A.D.2d at 28, 460 N.Y.S.2d at 949 (Niehoff, J., dissenting), *rev'd, Matter of Estate of Wilson*, 59 N.Y.2d 461, 452 N.E.2d 1228, the majority has no trouble in reaching its conclusion and, in fact, does so cursorily, conspiciously ignoring and failing to address *Shelley v. Kraemer*, 334 U.S. 1, 13, the seminal case in the area of judicial State action. Although the *Brown* court applied the doctrine of *Shelley v. Kraemer* to the partic-

ular facts of its own case, this court's marked reluctance to meet *Shelley* squarely is cause for grave concern; indeed, the majority's opinion is vulnerable both in law and in fact.

The *Brown* court did not hold, as my colleagues seem to suggest, that the judicial appointment of a substitute trustee is *per se* unconstitutional whenever the named trustee of an exclusionary trust is a State agency. Moreover, while the majority acknowledges that courts approach the issue of State action on a case by case basis, a fair reading of the majority's opinion discloses nothing but silence as to the State action analysis actually employed in *Brown* or why the rationale of *Brown* controls the facts in the case before us today. It is inconceivable, in my mind, that such important questions of constitutional law can be thought to be settled authoritatively for future cases *sub silentio*.

Significantly, the Third Circuit's decision in *Commonwealth of Pennsylvania v. Brown* derives much of its content and force from the Supreme Court's landmark decision in *Shelley v. Kraemer*. In *Shelley v. Kraemer*, the United States Supreme Court articulated a "judicial enforcement" doctrine of State action, holding that judicial enforcement of a private contract excluding non-Caucasians from the ownership of real property is State action violating the fourteenth amendment. *Shelley v. Kraemer*, 334 U.S. at 20. The dispute in *Shelley v. Kraemer* concerned a parcel of land subject to the terms of a racially restrictive covenant. When the property was sold to a black family, the neighboring property owners, parties to the restrictive covenant, sought redress for the breach in State court. The Missouri State courts enjoined the family from taking possession, divesting them of title, but the United States Supreme Court reversed. *Id.* at 5–6.

Noting, first, that the fourteenth amendment "erects no shield against merely private conduct, however discriminatory or wrongful," the Court repeated the well established rule that the prohibitions of the fourteenth amendment apply to actions by the State, but not to actions by private individuals. *Shelley v. Kraemer*, 334 U.S. at 13. The Court observed that the racial restrictions were not illegal and could be "effectuated by voluntary adherence to their terms," *id.* at 13, but distinguished an order of enforcement as "judicial action . . . [bearing] the clear and unmistakable imprimatur of the State." *Id.* at 20. Reasoning that "but for the active intervention of the state courts, supported by the full panoply of state power, [the purchasers] would have been free to occupy the properties in question without

restraint," the Court emphasized that the State courts had, by commanding compliance with the discriminatory restrictions, exercised the "full coercive power of government" to deny purchasers the enjoyment of property rights. *Id.* at 19.

Citing *Shelley v. Kraemer*, the school board urges that a court acts, in the constitutional sense, if it appoints a trustee who may, as a private individual, adhere to the discriminatory directives of a decedent's bequest. However, the theory of judicial State action advanced by the school board cannot be reconciled with either the facts or the law of *Shelley v. Kraemer*. Under the *Shelley* rationale, judicial enforcement of private rights may, in certain circumstances, involve State action. But the doctrine of judicial enforcement, as articulated in *Shelley v. Kraemer*, presumes the existence of both a private discriminatory agreement and an enforcement proceeding to redress a corresponding breach. The case before us is not one involving an agreement, nor is the whole force of the State being brought to bear upon a faithless trustee.

The situation presented in this case is, therefore, easily distinguishable from that presented in *Shelley v. Kraemer*, where the United States Supreme Court held unconstitutional the judicial action of State courts which had affirmatively enforced a private scheme of racial discrimination. *See Evans v. Abney*, 396 U.S. 435, 445 (1970). *Shelley v. Kraemer* imposes no requirement upon our courts to abandon longstanding and neutral principles of State trust law that authorize the court to appoint trustees when they are needed and to effectuate as nearly as possible the intentions of the trust settlor. Indeed, the authority to appoint trustees is a part of the law of this jurisdiction which the court is not at liberty to decline. Our cases clarify that "it is the duty of the probate court to appoint trustees whenever they are needed to administer trusts created by wills. . . ." *Carr v. Corning*, 73 N.H. at 366, 62 A. at 169. Such judicial action compels no discrimination and falls outside the doctrine of judicial enforcement.

While assailability under the fourteenth amendment turns upon a threshold finding of "state action of a particular character," *Civil Rights Cases*, 109 U.S. at 11, the United States Supreme Court has never attempted to define the level of State involvement necessary to convert "private action" into "State action," observing instead that "the question whether particular conduct is 'private,' on the one hand, or 'state action,' on the other, frequently admits of no easy answer." *Jackson v. Metropolitan Edison Co.*, 419 U.S. 345, 349–50

(1974) (citations omitted). The essential question, according to the Court, is whether "to some *significant* extent the State in any of its manifestations has . . . become involved in . . . private conduct" abridging individual rights, *Burton v. Wilmington Pkg. Auth.*, 365 U.S. 715, 722 (1961) (emphasis supplied), but the Court has declined to articulate a precise formula for recognition of significant, and hence actionable, State action. *Id.* Emphasizing the difficulty of drawing a constitutionally meaningful boundary within the public-private penumbra, the Court ruled in *Burton* that "[o]nly by sifting facts and weighing circumstances can the nonobvious involvement of the State in private conduct be attributed its true significance." *Id.* Thus, no single factor determines whether discrimination is chargeable to the State; rather, State action analysis requires a particularized inquiry into the facts and circumstances of each case, an assessment of the rights advanced by each party and, most importantly, a consideration, on balance, of the particular context in which those interests are asserted. *See Jackson v. Metropolitan Edison Co., supra* at 360 (Douglas, J., dissenting).

Although an intervivos trust may operate without government involvement, the testamentary trust has no such original vitality. *See* Clark, *Charitable Trusts, The Fourteenth Amendment and the Will of Stephen Girard*, 66 YALE L.J. 979, 1004 (1957). Indeed, the sanctity of wills, and the institution of inheritance in general, depends largely upon the State, because the power to dispose of property through testamentary devise is a privilege which the State confers by statute, and regulates through the process of probate administration. *See* RSA 551:2 (Supp. 1989); RSA 547:3. However, the fact that a private enterprise cannot be conducted in the absence of a governmentally conferred privilege is not, according to the United States Supreme Court, a relevant consideration in the State action analysis. *Moose Lodge No. 107 v. Irvis*, 407 U.S. 163, 173 (1972). In *Moose Lodge*, the Court rejected a claim that racial discrimination by a private club amounted to unconstitutional State action because the club held a liquor license under a State regulatory scheme. Referring to the State's regulatory involvement, the Court held that "[h]owever detailed this type of regulation may be in some particulars, it cannot be said to in any way foster or encourage racial discrimination." *Id.* Accordingly, to the extent that the testamentary trusts at issue here derive vitality from a legislative grant of power which breathes testamentary life into all wills executed in compliance with the requisite

formalities, *see* RSA 551:2 (Supp. 1989), their discriminatory provisions are not actionable under the fourteenth amendment.

It follows that a court may apply neutral principles of trust law permissive of private volition in the disposition of testamentary gifts and enable the private administration of an exclusionary trust by appointing a substitute trustee. That a court performs a function which permits the continuation of private discrimination does not make its acts State action; rather, "where the impetus for the discrimination is private, the State must have 'significantly involved itself with invidious discriminations' . . . in order for the discriminatory action to fall within the ambit of the constitutional prohibition." *Moose Lodge No. 107 v. Irvis*, 407 U.S. at 173. The core issue, then, is not whether the court has acted at all, but whether it has exercised coercive power or has become so significantly involved in conduct abridging private rights that the discrimination must in law be attributed to the State. *Rendell-Baker v. Kohn*, 457 U.S. 830, 840 (1982). Although trust law facilitates private arrangements and has as its objective the fulfillment of private intentions, the judicial act of appointing a private trustee cannot be said to involve the State significantly in private discrimination unless it is the State, and not the trustee, which is controlling the management of trust funds.

While the majority is determined to "reach the same result ordered in *Pennsylvania v. Brown*," the situation presented in this case is easily distinguishable from that presented in *Commonwealth of Pennsylvania v. Brown*, where the Orphan's Court of Pennsylvania acted upon its own motion to install its own group of trustees, and through a conspiciously unusual and unneutral method of appointment caused the trustees to swear an oath that they would "manage the will of Stephen Girard in accordance with the way it was written." *Commonwealth of Pennsylvania v. Brown*, 392 F.2d at 122.

As previously discussed, the Supreme Court of the United States held in *Pennsylvania v. Board of Trusts*, 353 U.S. at 231, that the City of Philadelphia, while exercising its obligations as trustee under the will of Stephen Girard, was engaged in State action proscribed by the fourteenth amendment. In response to the Supreme Court's decision, the Pennsylvania Orphan's Court "without notice or opportunity for the plaintiffs to do anything and with no request from the City or other source whatsoever, on its own initiative ousted Philadelphia as trustee and installed in place of the City Board, persons of its own choosing . . . [who] were sworn in by at least one of the Orphan's Court judges. . . ." *Id.* at 122. When the orphan plaintiffs

challenged the ouster of the City Board, the Pennsylvania Supreme Court found that the action of the Orphan's Court was not inconsistent with either the mandate of the United States Supreme Court or the fourteenth amendment, and subsequent application for certiorari was denied by the United States Supreme Court. *Id.* at 122–23. The Pennsylvania Legislature then enacted a statute specifically granting to the Pennsylvania Orphan's Court the power and duty to appoint substitute trustees in aid of Girard College. *Commonwealth of Pennsylvania v. Brown, supra* at 122 n.1.

However, ten years after the Supreme Court denied certiorari, the Girard litigation was re-instituted in federal district court, giving rise to the Third Circuit's decision in *Commonwealth of Pennsylvania v. Brown.* Stressing the aggravated and unusual State involvement in the administration of the Girard Trust for over 125 years, and the Orphan's Court's obvious efforts, by formulating an oath of allegiance to the Girard will, to manipulate the conduct of the private trustees, the *Brown* court characterized the Orphan's Court's substitution of trustees as action taken of its own initiative, and concluded that the Orphan's Court's action did "significantly encourage and involve the State in private discriminations." *Commonwealth of Pennsylvania v. Brown,* 392 F.2d at 125.

Because the facts of *Brown* bear no resemblance to those in the case at bar, that case cannot properly be cited as one which warrants the result reached by the majority today. *Cf. Matter of Johnson,* 93 A.D.2d at 40, 460 N.Y.S.2d at 955–56 (Niehoff, J., dissenting), *rev'd Matter of Estate of Wilson,* 59 N.Y.2d 461, 452 N.E.2d 1228. As Circuit Judge Van Dusen pointed out in a separate concurring opinion, neither the Orphan's Court nor the Pennsylvania Legislature had made itself merely neutral in the Girard College case. Referring to the Pennsylvania Legislature's action in passing a statute which declared it the duty of the Orphan's Court to appoint substitute trustees committed to upholding the Girard will, Circuit Judge Van Dusen noted the unconstitutional legislative State action underlying the Orphan's Court's action. Specifically, he emphasized the *ex post facto* nature of the enabling legislation, observing that "[o]f the forms of 'state action' in aid of discrimination that the Supreme Court has held . . . unconstitutional, that in *Reitman v. Mulkey* . . . seems most clearly apposite to the facts of this case." *Commonwealth of Pennsylvania v. Brown,* 392 F.2d at 127 (Van Dusen, J., concurring) (citing *Reitman v. Mulkey,* 387 U.S. 369 (1967)) (State

legislative enactment authorizing private racial discrimination violates fourteenth amendment).

Significantly, the facts of the case at bar do not include a legislative enactment demanding and encouraging discrimination, and hence, implicating *Reitman v. Mulkey supra.* Nor has the trial court, like the Orphan's Court, unilaterally, *sua sponte,* and without formal hearing, removed a trustee and sponsored substitute trustees of its own choosing, binding them under a unique State oath to carry out discriminatory policies. Indeed, I agree with the Third Circuit that the actions of both the Pennsylvania Legislature and the Orphan's Court lent to the practice of private discrimination an aura of public approval and sanction which transcended mere testamentary supervision; the State involvement in the Girard case was of the most notorious nature.

More importantly, however, a majority of the *Brown* court found that the facts of its case were "fairly comparable" to the facts in *Evans v. Newton,* 382 U.S. 296 (1966), and held, accordingly, that "the decision of the Supreme Court therein governs the issue before us." *Commonwealth of Pennsylvania v. Brown, supra* at 123. As will be seen, *Evans v. Newton,* like *Commonwealth of Pennsylvania v. Brown,* cannot properly be cited as a case which supports the result reached by my colleagues in the case before us today.

In *Evans v. Newton,* the testator, United States Senator August O. Bacon, devised a tract of land to the city officers of Macon, Georgia, to be used as "a park and pleasure ground" for whites only. *Evans v. Newton, supra* at 297. For a number of years the trust was administered according to its terms, but eventually the park was integrated. *Id.* Certain park managers then sued to remove the city as trustee and to appoint private trustees who could legally enforce racial segregation in the park. *Id.* at 297–98. The Georgia state courts accepted the resignation of the city as trustee and appointed private individuals in its place, but the United States Supreme Court reversed, the majority holding that the park could no longer be operated on a segregated basis. *Id.* at 302.

The Court did not address or even acknowledge the question whether judicial appointment of a private trustee can be considered State action. *See Evans v. Newton, supra* at 303 (White, J., concurring); *id.* at 312 (Black, J., dissenting); *id.* at 315 (Harlan and Stewart, JJ., dissenting). Rather, it focused on the character of the park as a public institution. Reasoning that the "momentum it acquired as a public facility [was] certainly not dissipated *ipso facto* by the ap-

pointment of 'private' trustees," the Court found that the predominant character and purpose of the park was municipal, and that the tradition of municipal control had become so firmly established that the transfer of title to private trustees did not *per se* disentangle the park from its municipal regime. *Id.* at 301–02. Ultimately, the trust failed and reverted to the testator's heirs. *Evans v. Abney*, 224 Ga. 826, 833, 165 S.E.2d 160, 166 (1968), *aff'd*, 396 U.S. 435 (1970).

The public function theory upon which *Evans v. Newton* rested is inapplicable to the trusts we consider today. Unlike Girard College, which had "become assimilated to a public boarding school or orphanage, 'municipal in nature,'" *Commonwealth of Pennsylvania v. Brown*, 270 F. Supp. 782, 792 (E.D. Pa. 1967), and Senator Bacon's park, which had rendered services "municipal in nature," *Evans v. Newton*, 382 U.S. at 301, there is nothing inherently "municipal" about a scholarship. Rather, scholarships are traditionally selective and exclusionary, evoking images of private endowments, family fortunes, and generous alumni from days gone by. Hardly to be confused with a government loan, although arguably as difficult to receive, the Wright and Alger scholarships perpetuate the memory of their founders and finance the education of a selected few, much as a private family trust might finance the education of its sons or daughters.

Whether or not the scholarships provide a "public function" by bestowing financial aid upon students who would otherwise seek the aid of the State, the United States Supreme Court has clarified in its recent decisions that the fact "[t]hat a private entity performs a function which serves the public does not make its acts state action." *Rendell-Baker v. Kohn*, 457 U.S. at 842. In conclusion, the public function served by the Wright and Alger trusts, if any, is not determinative of State action. Both trusts can survive constitutional scrutiny if the State's role in their administration is assumed by private individuals.

Finally, by contrast to the facts in *Commonwealth of Pennsylvania v. Brown*, this court cannot confidently conclude, as a majority of the Third Circuit did, that "[g]iven everything we know of [the testator], it is inconceivable that in this changed world he would not be quietly happy that his cherished project had raised its sights with the times. . . ." *Commonwealth of Pennsylvania v. Brown*, 392 F.2d at 125. Unlike the facts in *Brown*, where the testator had died in 1831, well before the Civil War, Mr. Alger died in 1970 when it had become as commonplace as it is today for young women and non-

Protestants to attend college. But notwithstanding the large numbers of women and non-Protestants pursuing higher education in 1970, Mr. Alger chose unequivocally to bestow his goodwill upon worthy college-bound Protestant boys. Accordingly, I do not believe it is fair to justify the result reached today by attributing to Mr. Wright and Mr. Alger "the changes in attitudes experienced by society since the creation of these trusts." Rather, I would point out instead that Wilhelmina F. Alger, the widow of Maurice A. Alger and his sole heir-at-law, has intervened in this action, seeking to be appointed as successor trustee, and has condemned the school board's attempt to redirect the Alger funds, observing that such an expansion of trust purposes is in keeping with the school board's own idea of fairness, but is contrary to the declared sentiments of her late husband's will.

I would conclude, then, that a court does not act in the constitutional sense when it applies neutral principles of trust law to enable the initial existence of a discriminatory testamentary trust or to permit its continuation. *See Matter of Estate of Wilson*, 59 N.Y.2d 461, 452 N.E.2d 1228. Freedom of testation is a cherished right which permits a testator to breathe his last, secure in the expectation that the law will venerate, and not frustrate, his last wishes. A court may, accordingly, replace an unfit or unsuitable trustee as part of its general duties in supervising the administration of a charitable testamentary trust, but the court is not free to rewrite a decedent's will or to attribute to him, posthumously, a desire to spend his bounty for the collective good when the designated and preferred class of beneficiaries has not been exhausted.