NOTICE: This opinion is subject to motions for rehearing under Rule 22 as well as formal revision before publication in the New Hampshire Reports. Readers are requested to notify the Reporter, Supreme Court of New Hampshire, One Charles Doe Drive, Concord, New Hampshire 03301, of any editorial errors in order that corrections may be made before the opinion goes to press. Errors may be reported by E-mail at the following address: reporter@courts.state.nh.us. Opinions are available on the Internet by 9:00 a.m. on the morning of their release. The direct address of the court's home page is: http://www.courts.state.nh.us/supreme.

THE SUPREME COURT OF NEW HAMPSHIRE

_____

4th Circuit Court-Laconia District Division
No. 2017-0116

THE STATE OF NEW HAMPSHIRE

v.

HEIDI C. LILLEY

THE STATE OF NEW HAMPSHIRE

v.

KIA SINCLAIR

THE STATE OF NEW HAMPSHIRE

v.

GINGER M. PIERRO

Argued: February 1, 2018
Opinion Issued: February 8, 2019

Gordon J. MacDonald, attorney general (Susan P. McGinnis, senior assistant attorney general, on the brief and orally), for the State.

Liberty Legal Services, of Manchester (Dan Hynes on the brief and orally), for the defendants.

American Civil Liberties Union of New Hampshire, of Concord (Gilles R. Bissonnette on the brief), as amicus curiae.

HANTZ MARCONI, J. The defendants, Heidi Lilley, Kia Sinclair, and Ginger Pierro, appeal a ruling of the Circuit Court (Carroll, J.) that they violated a City of Laconia ordinance prohibiting them from appearing in a state of nudity in a public place. See Laconia, N.H., Code of Ordinances ch. 180, art. I, § 180-2 (1998). We affirm.

I.    Background

The following facts are drawn from the trial court's order on the defendants' motion to dismiss or are otherwise supported by the record. On May 28, 2016, Pierro went to Endicott Park Beach in Laconia. At the hearing on the defendants' motion to dismiss, Pierro testified that she "was topless" and was there "to enjoy the beach." She agreed with defense counsel that she was "performing yoga on the beach." She stated that she "was violently harassed" by "[s]everal citizens," but that "out of everybody on the beach, there were only actually a handful that were upset."

Sergeant Black of the Laconia Police Department testified that, on that same day, he and Officer Callanan responded to the beach because the department had "received several calls about a female . . . doing nude yoga." Callanan testified that they approached a woman, later identified as Pierro, who was "not wearing any shirt and her breasts, as well as her nipples, were both exposed." Callanan stated that she "made attempts to speak to" Pierro, but that Pierro "continued to do her yoga poses." She explained that "after about a minute or so, [Pierro] looked up and acknowledged that we were, in fact, trying to speak to her." She testified that they "explained to [Pierro] that the reason [they] were making contact with her was in reference to a Laconia City Ordinance, since her nipples were exposed on the beach in a public place." Callanan stated that they asked Pierro "multiple times to cover up, to put her bathing suit top back on, or put her shirt back on," but that Pierro "refused."

Callanan testified that Pierro was arrested for violating Laconia City Ordinance § 180-2 (the ordinance), which states, in relevant part, that "it shall be unlawful for any person to knowingly or intentionally, in a public place: . . . [a]ppear in a state of nudity." "Nudity" is defined as "[t]he showing of the human male or female genitals, pubic area or buttocks with less than a fully opaque covering, or the showing of the female breast with less than a fully opaque covering of any part of the nipple." Laconia, N.H., Code of Ordinances ch. 180, art. I, § 180-4 (1998).

In 2015, Sinclair became involved in the "Free the Nipple" movement. Sinclair testified that she was one of the people who "started" the movement in

2

New Hampshire after having her son and realizing "that there was a very big stigma on breastfeeding." She explained that she believed that breasts, specifically nipples, are "hypersexualize[d]" and "consider[ed] pornographic and taboo," which she stated results "in that stigma" and "contributes to the low breastfeeding rates that the United States has compared to the rest of the world." Sinclair told Lilley about the movement, which Lilley then joined. Lilley testified that she is "a feminist" and joined the movement because she "believe[s] in the equality of the male and female."

On May 31, 2016, Sinclair and Lilley went topless to Weirs Beach in Laconia. While at the beach, they were arrested for violating the ordinance. Sinclair testified that she "purposely engaged in civil disobedience knowing that the City of Laconia has an ordinance against the exposure of the female nipple and areola." She stated that she was "protesting [Pierro's] case where she had been arrested a few days prior." Lilley testified that she was also protesting Pierro's arrest and that she "announced to the arresting police officer that [she] was acting in a protest and that [she] did not believe that [she] could be arrested for protesting." She further agreed with the prosecutor that, on that day, she "chose to take it upon [herself] to violate the ordinance to give attention to [her] cause."

The defendants jointly moved to dismiss the charges against them. They argued that the ordinance violates the guarantee of equal protection and their right to free speech under the State and Federal Constitutions. They further contended that the City of Laconia lacked the authority to enact the ordinance and that the ordinance was preempted by RSA 645:1 (2016). Finally, the defendants maintained that the ordinance violates RSA chapter 354-A. See RSA ch. 354-A (2009 & Supp. 2017) (amended 2018). The State objected. Following a hearing, the court denied the defendants' motion. The court subsequently found the defendants guilty of violating the ordinance. This appeal followed.

On appeal, the defendants argue that the trial court erred by denying their motion to dismiss because the ordinance: (1) violates their right to equal protection under the State and Federal Constitutions; (2) violates their rights to free speech and expression under the State and Federal Constitutions; (3) does not fall within the regulatory authority granted to the City of Laconia by the legislature; (4) is preempted by RSA 645:1; and (5) violates RSA chapter 354-A. We will address each of the defendants' arguments in turn.

II.     Equal Protection

The defendants first argue that the ordinance violates their right to equal protection under Part I, Article 2 of the New Hampshire Constitution and the Fourteenth Amendment to the United States Constitution. See N.H. CONST. pt. I, art. 2; U.S. CONST. amend. XIV. We review the constitutionality of local

3

ordinances <u>de</u> <u>novo</u>. <u>McKenzie v. Town of Eaton Zoning Bd. of Adjustment</u>, 154 N.H. 773, 777 (2007). We first address the defendants' arguments under the State Constitution and cite federal opinions for guidance only. <u>State v. Ball</u>, 124 N.H. 226, 231-33 (1983).

We begin by addressing the scope of the defendants' challenge to the ordinance. An appellant may challenge the constitutionality of a statute or an ordinance[1] by asserting a facial challenge, an as-applied challenge, or both. <u>See</u> <u>State v. Hollenbeck</u>, 164 N.H. 154, 158 (2012). A facial challenge is a head-on attack of a legislative judgment, an assertion that the challenged statute violates the Constitution in all, or virtually all, of its applications. <u>Id</u>. To prevail on a facial challenge, the challenger must establish that no set of circumstances exist under which the challenged statute or ordinance would be valid. <u>Id</u>. On the other hand, an as-applied challenge concedes that the statute may be constitutional in many of its applications, but contends that it is not so under the particular circumstances of the case. <u>Id</u>.

Here, the defendants do not concede that the relevant portion of the ordinance is constitutional in any circumstance. They argue that "the ordinance makes a gender-based classification on its face." We construe their claim to be a facial challenge to the portion of the ordinance that prohibits "the showing of the female breast with less than a fully opaque covering of any part of the nipple" in a public place. <u>See</u> <u>Laconia, N.H., Code of Ordinances</u> ch. 180, art. I, §§ 180-2, 180-4. Thus, the defendants must demonstrate that there is no set of circumstances under which this ordinance might be valid. <u>See</u> <u>Hollenbeck</u>, 164 N.H. at 158.

Next, we must determine the appropriate standard of review to apply to the ordinance. <u>In re Sandra H.</u>, 150 N.H. 634, 637 (2004). We do this by examining the purpose and scope of the State-created classification and the individual rights affected. <u>Id</u>. Classifications based upon suspect classes are subject to strict scrutiny: the government must show that the legislation is necessary to achieve a compelling government interest and is narrowly tailored. <u>Cmty. Res. for Justice v. City of Manchester</u>, 154 N.H. 748, 759 (2007). Classifications which affect a fundamental right may be subject to strict scrutiny depending on the nature of the right and the manner in which it is affected. <u>See</u> <u>Estate of Cargill v. City of Rochester</u>, 119 N.H. 661, 667 (1979); <u>see also</u> <u>Bleiler v. Chief, Dover Police Dep't</u>, 155 N.H. 693, 697-98 (2007); <u>Lamarche v. McCarthy</u>, 158 N.H. 197, 204 (2008). Below strict scrutiny is intermediate scrutiny, which is triggered when the challenged classification involves important substantive rights, <u>Sandra H.</u>, 150 N.H. at 637-38, and which requires the government to show that the challenged legislation is substantially related to an important government interest. <u>Cmty. Res.</u>, 154

---

[1] No party asserts that, for the purposes of considering their constitutional arguments, it makes any difference that we are dealing with an ordinance rather than a statute.

N.H. at 762. Finally, absent a classification based upon suspect classes, affecting fundamental rights, or involving important substantive rights, the constitutional standard of review is that of rationality. Sandra H., 150 N.H. at 638; cf. Gonya v. Comm'r, N.H. Ins. Dept., 153 N.H. 521, 532-33 (2006). Our rational basis test requires that legislation be rationally related to a legitimate government interest. Boulders at Strafford v. Town of Strafford, 153 N.H. 633, 639 (2006). Under this test, the party challenging the statute or ordinance must show that whatever classification is promulgated is arbitrary or without some reasonable justification. Id. at 640.

The defendants argue that the ordinance discriminates on the basis of gender and/or sex; thus, strict scrutiny is the appropriate standard of review. The State counters that the ordinance only distinguishes between men and women on the basis of their different physical characteristics; thus, the rational basis test applies.

Under federal equal protection law, pursuant to the Fourteenth Amendment, a classification based on gender triggers intermediate scrutiny. United States v. Virginia, 518 U.S. 515, 532-33 (1996). Part I, Article 2 of the New Hampshire Constitution states, however, "Equality of rights under the law shall not be denied or abridged by this state on account of race, creed, color, sex or national origin." N.H. CONST. pt. I, art. 2. Thus, under the New Hampshire Constitution, gender is a suspect class and classifications based thereon trigger strict scrutiny. See Cheshire Medical Center v. Holbrook, 140 N.H. 187, 189 (1995); see also LeClair v. LeClair, 137 N.H. 213, 222 (1993) ("We apply the strict scrutiny test . . . when the classification involves a suspect class based on race, creed, color, gender, national origin, or legitimacy . . . ." (quotation omitted)) (superseded by statute on other grounds). In Holbrook, we applied strict scrutiny to the common law doctrine of necessaries, which made husbands legally liable for essential goods or services provided to their wives by third parties. Holbrook, 140 N.H. at 189-90. We concluded that there was no compelling justification for the gender bias embodied in the traditional necessaries doctrine. Id. at 189. However, Holbrook did not address the type of legislation that is at issue here: a proscription that imposes requirements on both men and women, but applies to women somewhat differently. Thus, Holbrook, the only case in which we have applied strict scrutiny to a gender-based classification, does not necessarily establish that the Laconia ordinance triggers strict scrutiny.

Courts in other jurisdictions have generally upheld laws that prohibit women but not men from exposing their breasts against equal protection challenges. See generally Kimberly J. Winbush, Annotation, Regulation of Exposure of Female, but not Male, Breasts, 67 A.L.R.5th 431 (1999) (collecting cases). But see Free the Nipple Fort Collins v. City of Fort Collins, Colorado, 237 F. Supp. 3d 1126, 1133 (D. Colo. 2017) (concluding that equal protection challenge to ordinance prohibiting women but not men from exposing their

5

breasts was likely to succeed on the merits).  In so doing, however, they have often left unclear the applicable standard of review.  See Tolbert v. City of Memphis, Tenn., 568 F. Supp. 1285, 1290 (W.D. Tenn. 1983); City of Jackson v. Lakeland Lounge, 688 So. 2d 742, 751-52 (Miss. 1996); State v. Turner, 382 N.W.2d 252, 255-56 (Minn. Ct. App. 1986); Free the Nipple – Springfield Residents Promoting Equality v. City of Springfield, Missouri, No. 15-3467-CV-S-BP, 2017 WL 6815041, at *2-3 (W.D. Mo. Oct. 4, 2017).  Some courts have assumed without deciding that such laws are gender-based and thus trigger intermediate scrutiny under the Federal Constitution, and then upheld them on the grounds that the heightened requirements of intermediate scrutiny were satisfied.  See Ways v. City of Lincoln, 331 F.3d 596, 600 (8th Cir. 2003); United States v. Biocic, 928 F.2d 112, 115 (4th Cir. 1991); J & B Soc. Club No. 1, Inc. v. City of Mobile, 966 F. Supp. 1131, 1139 (S.D. Ala. 1996).  Others have explicitly held that laws which prohibit women but not men from exposing their breasts are gender-based and trigger intermediate scrutiny either under federal equal protection law or an analogous state constitutional provision.  See Tagami v. City of Chicago, 875 F.3d 375, 380 (7th Cir. 2017), cert. denied, 138 S. Ct. 1577 (2018) (Federal Constitution); Buzzetti v. City of New York, 140 F.3d 134, 141-42 (2d Cir. 1998) (Federal Constitution); Craft v. Hodel, 683 F. Supp. 289, 299 (D. Mass. 1988) (Federal Constitution); City of Tucson v. Wolfe, 917 P.2d 706, 707 (Ariz. Ct. App. 1995) (state constitution); Dydyn v. Department of Liquor Control, 531 A.2d 170, 175 (Conn. App. Ct. 1987) (state constitution).  Still others appear to have concluded that such laws do not trigger any form of heightened constitutional review.  See Schleuter v. City of Fort Worth, 947 S.W.2d 920, 925-26 (Tex. App. 1997) (state constitution); City of Seattle v. Buchanan, 584 P.2d 918, 920-22 (Wash. 1978) (en banc) (state constitution); Eckl v. Davis, 124 Cal. Rptr. 685, 695-96 (Ct. App. 1975); see also Hang On, Inc. v. City of Arlington, 65 F.3d 1248, 1256-57 (5th Cir. 1995).

Among states, like New Hampshire, that define gender as a suspect class under their respective state constitutions, we are aware of none that apply strict scrutiny to ordinances similar to Laconia's.[2]  See Buchanan, 584 P.2d at 921; City of Albuquerque v. Sachs, 92 P.3d 24, 27, 29 (N.M. Ct. App. 2004).  Compare Williams v. City of Fort Worth, 782 S.W.2d 290, 296 (Tex. App. 1989) (recognizing that sex is a suspect class under Texas Constitution), with Schleuter, 947 S.W.2d at 925-26 (applying no heightened scrutiny to ordinance that restricted locations of businesses featuring female topless dancers).

In Buchanan, for example, the Washington Supreme Court held that an ordinance which prohibited both men and women from being nude in public, but defined nudity for women to include exposure of the breast, "d[id] not . . . impose unequal responsibilities on women" because the ordinance "applie[d] alike to men and women, requiring both to cover those parts of their bodies

---

[2] Relatedly, we are aware of no court with precedent-setting authority that has held such an ordinance unconstitutional.  But cf. Free the Nipple Fort Collins, 237 F. Supp. 3d at 1133.

6

which are intimately associated with the procreation function." Buchanan, 584 P.2d at 921. The court noted, "It is true that [the ordinance] requires the draping of more parts of the female body than of the male, but only because there are more parts of the female body intimately associated with the procreative function. The fact that the ordinance takes account of this fact does not render it discriminatory." Id. at 922. Thus the ordinance did not "classify . . . on the basis of sex." Id. at 921.

The Eckl court reasoned similarly:

> Nature, not the legislative body, created the distinction between that portion of a woman's body and that of a man's torso. Unlike the situation with respect to men, nudity in the case of women is commonly understood to include the uncovering of the breasts. Consequently, in proscribing nudity on the part of women it was necessary to include express reference to that area of the body. The classification is reasonable, not arbitrary, and rests upon a ground of difference having a fair and substantial relation to the object of the legislation, so that all persons similarly circumstanced are treated alike.

Eckl, 124 Cal. Rptr. at 696.

While Washington and California appear to address these considerations in the threshold analysis of the applicable standard of review, other courts that apply intermediate scrutiny to these types of laws have upheld them based on similar reasoning. See, e.g., Craft, 683 F. Supp. at 300 (quoting Eckl); see also Michael M. v. Sonoma County Superior Court, 450 U.S. 464, 468-69 (1981) (plurality opinion) ("[T]his court has consistently upheld statutes where the gender classification . . . realistically reflects the fact that the sexes are not similarly situated in certain circumstances.").

We conclude that the Laconia ordinance does not classify on the basis of gender. The ordinance prohibits both men and women from being nude in a public place. See Laconia, N.H., Code of Ordinances ch.180, art. 1, §§ 180-2, 180-4. "[T]he ordinance here does not prevent exposure by one sex only." Buchanan, 584 P.2d at 922. That the ordinance defines nudity to include exposure of the female but not male breast does not mean that it classifies based upon a suspect class. See id.; Gonya, 153 N.H. at 532. "Unlike the situation with respect to men, nudity in the case of women is commonly understood to include the uncovering of the breasts." Eckl, 124 Cal. Rptr. at 696. The ordinance merely reflects the fact that men and women are not fungible with respect to the traditional understanding of what constitutes nudity. See id.; Sachs, 92 P.3d at 29; see also Biocic, 928 F.2d at 115-16 (noting that female breasts have traditionally been regarded by society as an erogenous zone); Buzzetti, 140 F.3d at 143 (noting that, unlike the male breast,

7

"public exposure of the female breast is rare under the conventions of our society, and almost invariably conveys sexual overtones"); cf. Virginia, 518 U.S. at 533 ("The two sexes are not fungible; a community made up exclusively of one sex is different from a community composed of both." (quotation and brackets omitted)).

Nor do we find that the ordinance affects a fundamental right. See Eckl, 124 Cal. Rptr. at 695. Although freedom of speech is a fundamental right, see McGraw v. Exeter Region Coop. Sch. Dist., 145 N.H. 709, 713 (2001), "[b]eing in a state of nudity is not an inherently expressive condition," Erie v. Pap's A.M., 529 U.S. 277, 289 (2000). Even assuming without deciding that the defendants' nudity in this case was expressive, not every restriction of a right classified as fundamental incurs strict scrutiny. Bleiler, 155 N.H. at 697-98. For limitations upon a fundamental right to be subject to strict scrutiny, there must be an actual deprivation of the right. Lamarche, 158 N.H. at 204; see also Estate of Cargill, 119 N.H. at 667. For the reasons discussed in Part III, infra, there was no such deprivation here. Similarly, intermediate scrutiny does not apply because the ordinance does not involve an important substantive right. Cf. LeClair, 137 N.H. at 222-23. Hence, rational basis is the appropriate standard of review for this ordinance.

Applying the standard, we have little trouble concluding that the defendants have not carried the heavy burden of mounting a successful facial attack to an ordinance analyzed only for rationality. The stated purpose of the ordinance is to uphold and support "public health, public safety, morals and public order." Laconia, N.H., Code of Ordinances ch. 180, art. I, § 180-1 (1998). Under the terms of the ordinance, "[t]he conduct prohibited . . . is deemed to be contrary to the societal interest in order and morality." Id. Federal courts have found these to be important or substantial interests under intermediate scrutiny, let alone legitimate ones under rational basis review. See Tagami, 875 F.3d at 379-80 (finding the purposes of "promoting traditional moral norms and public order" to be "important enough to survive [intermediate] scrutiny"); Biocic, 928 F.2d at 115-16 (finding "important" the "government interest . . . [in] protecting the moral sensibilities of that substantial segment of society that still does not want to be exposed" to parts of the body "that traditionally in this society have been regarded as erogenous zones"); Craft, 683 F. Supp. at 299-300 (finding a sufficient state interest in "protect[ing] the public from invasions of its sensibilities"); see also Barnes v. Glen Theatre, Inc., 501 U.S. 560, 569 (1991). We likewise conclude that they are legitimate government interests. "The traditional police power of the States is defined as the authority to provide for the public health, safety, and morals." Barnes, 501 U.S. at 569. Furthermore, the ordinance is rationally related to advancing those interests. See id. at 571-72; Craft, 683 F. Supp. at 300-01.

For these reasons, we hold that the ordinance does not violate Part I, Article 2 of the New Hampshire Constitution.[3]

The dissent faults us for seeking guidance from other courts in ascertaining whether Laconia's ordinance classifies based on gender. However, as demonstrated by the lack of any meaningful discussion of our precedent in the dissent, we have little in the way of help from our own cases in answering this question. Although we applied strict scrutiny to a gender-based classification in Holbrook, see Holbrook, 140 N.H. at 189-90, as already discussed, the law at issue in Holbrook did not impose requirements on both men and women. The dissent identifies no other instance, nor are we aware of any, in which we have concluded that a law challenged on equal protection grounds contained a gender-based classification and therefore was subject to strict scrutiny. But cf. In re Certain Scholarship Funds, 133 N.H. 227, 231 (1990) (concluding that the "State's participation in the administration of" certain scholarships established by trust but expressly limited to one gender "cannot even withstand the lowest level of judicial scrutiny," and thus declining to "determine what level of review should be employed in cases of gender . . . discrimination" under Part I, Article 2). Thus, our prior cases are not helpful in analyzing whether Laconia's ordinance is gender-based. In other words, to the extent the dissent contends that our precedent requires us to determine the standard of review in equal protection challenges by examining the purpose and scope of the State-created classification, we agree. The primary issue on which this case turns, however, is what that examination reveals when applied to the unique facts of this case.

We agree with the dissent, of course, that this court has a duty "to make an independent determination of the protections afforded in the New Hampshire Constitution." Ball, 124 N.H. at 231. However, where our previous cases have not had occasion to answer the question presented here, we fail to see how we depart from that duty by checking our work against other courts, many of them in states with equal protection provisions similar to our own. See TEX. CONST. art. 1, § 3a ("Equality under the law shall not be denied or abridged because of sex, race, color, creed, or national origin."); Schleuter, 947 S.W.2d at 925-26; WA. CONST. art. 31, § 1 ("Equality of rights and responsibility under the law shall not be denied or abridged on account of sex."); Buchanan, 584 P.2d at 920-22; N.M. CONST. art. 2, § 18 ("Equality of rights under law shall not be denied on account of the sex of any person."); Sachs, 92 P.3d at 29. Indeed, the dissent itself relies on out-of-jurisdiction cases to support its contention that the Laconia ordinance contains a gender-

---

[3] We reach the same result under the Federal Constitution as we do under the State Constitution. Federal courts applying federal equal protection analysis have near-uniformly upheld ordinances similar to Laconia's even when subjecting them to intermediate scrutiny. See Tagami, 875 F.3d at 379-80; Ways, 331 F.3d at 599-600; Buzzetti, 140 F.3d at 144; Biocic, 928 F.2d at 115-16; J & B Soc. Club No. 1, 966 F. Supp. at 1139-40; Craft, 683 F. Supp. at 299-301. But see Free the Nipple Fort Collins, 237 F. Supp. 3d at 1133.

based classification. To the extent the dissent simply finds those cases more persuasive, that is all the more reason for us, in fulfilling our obligation to independently interpret Part I, Article 2, to consider the full range of how courts have tackled this difficult question, lest we simply pick and choose from amongst courts whose holdings align with our own personal ideologies.

The dissent also contends that there is "no principled reason why" our approach to analyzing Laconia's ordinance "would not apply with equal force to other laws" that afford differing treatment to people of different races, religions, colors, or national origins. We disagree. The facts of this case, including the particular way in which men and women differ with respect to the traditional understanding of nudity, are unique. Indeed, the dissent does not even attempt to deny that nudity is simply different for men than for women. At the same time, it is undeniably true that classifications based on immutable characteristics have "long [been] recognized as in most circumstances irrelevant," Adarand Constructors, Inc. v. Pena, 515 U.S. 200, 227 (1995) (quotation omitted), and therefore are generally improper bases for differing treatment under the law. However, based on the unique way in which men and women differ with respect to nudity, we conclude that the ordinance does not afford different treatment for men and women based on gender. As for the dissent's assertion that, given our approach to analyzing Laconia's ordinance, we would not apply strict scrutiny in a case that concerned laws imposing more onerous retirement benefit requirements for women than for men, it suffices to say that any such case would be controlled by our analysis in Holbrook. See Holbrook, 140 N.H. at 189-90.

At various points throughout its opinion, the dissent lumps the ordinance, and our analysis of it, together with "pervasive and perverse discrimination," "romantic paternalism," "unexamined stereotypes," and "archaic prejudice." The resort to such hyperbole reveals the flawed nature of its reasoning. It assumes that, because the ordinance does not allow men and women to engage in precisely the same mode of dress, it must contain a gender-based classification. Respectfully, we find this approach deceptively simplistic. For strict scrutiny to apply, it is not enough that men and women be treated differently: they must be treated differently based upon a gender-based classification. See Buchanan, 584 P.2d at 921-22. For the reasons already discussed, we find no gender-based classification in the ordinance. It is telling that the dissent has identified no case, nor are we aware of any, in which a court sitting in a jurisdiction with an Equal Rights Amendment analogous to our own has applied strict scrutiny to an ordinance like Laconia's. Neither can we ignore that no court with precedent-setting authority has held such an ordinance unconstitutional.

Nor should the siren call of "equal rights" lead us to forget our constitutional role. In the absence of a suspect classification or a fundamental right, courts will not second guess legislative bodies as to the wisdom of a

specific law.  Winnisquam Reg. Sch. Dist. v. Levine, 152 N.H. 537, 539 (2005).
That the ordinance may or may not "reflect sociological insight, or shifting
social standards" is not determinative for our purposes.  Buchanan, 584 P.2d
at 921 (quotation omitted).  "Our obligation" is to interpret and apply the law,
"not to mandate our own moral code."  Planned Parenthood of Southeastern PA
v. Casey, 505 U.S. 833, 850 (1992).  "We are told that concepts of morality and
propriety are changing"; if so, then "it can reasonably be expected that public
demand will soon make it imperative that this portion of the ordinance be
repealed."  Buchanan, 584 P.2d at 920-21.  The people of Laconia may make
such a decision, but this court will not make it for them.

III.    Freedom of Speech

        The defendants next argue that the ordinance violates their rights to
freedom of speech and expression under Part I, Article 22 of the New
Hampshire Constitution and the First Amendment to the United States
Constitution.  They contend that, "[b]y appearing topless in public, [the
defendants] engaged in speech and expression . . . to demonstrate to others
[their] political viewpoint and message that the female nipple is not a sexual
object."  They further maintain that, by doing so, they sought "to bring
attention to gender equality and how the female nipple is treated different[ly]
than the male nipple," "to continue the advancement of women's rights[,] and
to have the conduct of being topless be accepted and normalized."

        We first address the defendants' claims under the State Constitution,
and rely on federal law only to aid in our analysis.  Ball, 124 N.H. at 231-33.
Once again, our review of this constitutional question is de novo.  McKenzie,
154 N.H. at 777.

        Part I, Article 22 of the New Hampshire Constitution provides: "Free
speech and liberty of the press are essential to the security of freedom in a
state: They ought, therefore, to be inviolably preserved."  N.H. CONST. pt. I, art.
22.  Similarly, the First Amendment prevents the passage of laws "abridging
the freedom of speech."  U.S. CONST. amend. I.  It applies to the states through
the Fourteenth Amendment to the United States Constitution.  Lovell v. Griffin,
303 U.S. 444, 450 (1938).

        When assessing whether government restrictions impermissibly infringe
on free speech, we must first address whether the speech or conduct at issue is
protected by the State Constitution.  State v. Bailey, 166 N.H. 537, 540-41
(2014).  The State and Federal Constitutions contain robust guarantees of free
speech, but they do not offer absolute protection to all speech under all
circumstances and in all places.  State v. Biondolillo, 164 N.H. 370, 373 (2012).
We do not accept "the view that an apparently limitless variety of conduct can
be labeled 'speech' whenever the person engaging in the conduct intends
thereby to express an idea"; however, "we acknowledge that conduct may be

11

sufficiently imbued with elements of communication to fall within the scope of constitutional protections." Bailey, 166 N.H. at 541 (quotation, brackets, and ellipsis omitted); see State v. Comley, 130 N.H. 688, 691 (1988) (noting that although statute did not specifically regulate speech, its application "may have such an effect where a prosecution under the statute concerns conduct encompassing expressive activity").

The State contends that the defendants' conduct did not constitute protected speech. Although "[b]eing in a state of nudity is not an inherently expressive condition," Pap's A.M., 529 U.S. at 289, under the circumstances of this case we will assume, without deciding, that the defendants engaged in constitutionally protected expressive conduct. See Clark v. Community for Creative Non-Violence, 468 U.S. 288, 293 (1984) (assuming, but not deciding, that overnight sleeping in connection with demonstration was constitutionally protected expressive conduct); Craft, 683 F. Supp. at 292 (assuming dubitante that plaintiffs' shirt-free appearances at Cape Cod National Seashore constituted "expressive conduct protected to some extent by the First Amendment" (quotation omitted)); see also Bailey, 166 N.H. at 541. We must, therefore, determine whether the ordinance violates their right to free speech.

"It is well settled that the government need not permit all forms of speech on property that it owns and controls." Bailey, 166 N.H. at 541 (quotation, brackets, and ellipsis omitted). "The standards by which limitations on speech must be evaluated differ depending on the character of the property." Id. at 542 (quotation and brackets omitted). Government property generally falls into three categories — traditional public forums, designated public forums, and limited public forums. Id. "A traditional public forum is government property which by long tradition or by government fiat has been devoted to assembly and debate." Id. (quotation omitted). In such forums, the government may impose reasonable time, place, and manner restrictions. Doyle v. Comm'r, N.H. Dep't of Resources & Economic Dev., 163 N.H. 215, 221 (2012). If a restriction is content-based, it must be narrowly tailored to serve a compelling government interest. Id.; Reed v. Town of Gilbert, Ariz., 135 S. Ct. 2218, 2226 (2015) ("Content-based laws—those that target speech based on its communicative content—are presumptively unconstitutional and may be justified only if the government proves that they are narrowly tailored to serve compelling state interests."). If a restriction is content-neutral, it must satisfy a slightly less stringent test — it must be narrowly tailored to serve a significant government interest. Doyle, 163 N.H. at 221; see Biondolillo, 164 N.H. at 373 (noting that federal precedent employs the same standard to assess constitutionality of restrictions on the time, place, and manner of expressive activities taking place in a public forum); see also Clark, 468 U.S. at 293.

The defendants suggest, and the State does not dispute, that the beaches at which the defendants were arrested constitute traditional public forums. Thus, for purposes of this appeal, we also will assume, without deciding, that

the respective beaches constitute traditional public forums. Nonetheless, the defendants argue that "[t]ime, place, and manner analysis is not appropriate" because the ordinance regulates speech based upon its content and viewpoint. They contend, therefore, that we must subject the ordinance to strict scrutiny review. We disagree.

"Government regulation of speech is content based if a law applies to particular speech because of the topic discussed or the idea or message expressed." Reed, 135 S. Ct. at 2227; see also Biondolillo, 164 N.H. at 374. On the other hand, a law is a content-neutral speech regulation if it is "justified without reference to the content of the regulated speech." City of Renton v. Playtime Theatres, Inc., 475 U.S. 41, 48 (1986) (quotation and emphasis omitted).

We agree with the trial court that the ordinance is not content-based. The ordinance is, on its face, a general prohibition on public nudity. See Pap's A.M., 529 U.S. at 290 (concluding that ordinance banning public nudity was not related to the suppression of expression). As the United States District Court for the District of Massachusetts ruled regarding a National Park Service regulation prohibiting public nudity at the seashore, the ordinance is "plainly not based upon either the content or subject matter of speech." Craft, 683 F. Supp. at 293 (quotations omitted). There is nothing in the text of the ordinance itself that suggests "that one group's viewpoint is to be preferred at the expense of others." Id. (quotation omitted). It does not target nudity meant to advance women's rights or desexualize the female nipple. Rather, it prohibits all nudity, regardless of whether the nudity is accompanied by expressive activity. See Pap's A.M., 529 U.S. at 290. In that sense, the ordinance merely regulates the manner in which activities may be carried out in that they cannot be carried out in the nude. We, therefore, conclude that the ordinance is content-neutral.

As we stated, if a restriction is content-neutral, it must be narrowly tailored to serve a significant government interest. Doyle, 163 N.H. at 221. Content-neutral restrictions must also leave open ample alternative channels for communication. Id. On appeal, the defendants do not challenge the trial court's rulings that the ordinance meets these requirements. Rather, their only argument is that the ordinance is content-based and viewpoint discriminatory and, thus, should be subject to strict scrutiny review. Because we necessarily reject that argument by concluding that the ordinance is content-neutral, and the defendants have not otherwise demonstrated that the trial court's rulings were erroneous, we need not conduct a further constitutional analysis.

Finally, the defendants pose various scenarios in their brief regarding circumstances under which, they argue, the ordinance would be unlikely to be applied. For example, they state that "presumably Laconia would not be enforcing the ordinance against pre-pubescent females" and that it is

"questionable if the City would be enforcing the ordinance against a female who had a double mastectomy who essentially lacks any breast tissue even if their nipples were exposed."  Beyond these bare assertions, however, they do not develop a legal argument.  Because a mere laundry list of complaints regarding adverse rulings by the trial court, without developed legal argument, is insufficient to warrant judicial review, we decline to respond to these assertions.[4]  See State v. Ayer, 154 N.H. 500, 513 (2006) (declining to address defendant's due process argument as he had not explained how his rights were violated and had only argued in "conclusory terms").

Accordingly, for these reasons, we cannot say that the trial court erred by determining that the ordinance does not violate the defendants' rights to free speech and expression under the State Constitution.  As the Federal Constitution affords the defendants no greater protection than the State Constitution under the circumstances presented here, see Tagami, 875 F.3d at 379 (citing Barnes, 501 U.S. at 568-69), we also find no violation of the Federal Constitution.

IV.    Authorization to Enact the Ordinance

The defendants next argue that the ordinance is invalid because the City of Laconia did not have the statutory authority to enact the ordinance.  We find this argument unpersuasive.

"[W]hile general statutes must be enacted by the legislature, it is plain the power to make local regulations, having the force of law in limited localities, may be committed to other bodies representing the people in their local divisions, or to the people of those districts themselves."  State v. Grant, 107 N.H. 1, 3 (1966) (quotation omitted).  "Our whole system of local government in cities, villages, counties and towns, depends upon that distinction.  The practice has existed from the foundation of the state, and has always been considered a prominent feature in the American system of government."  Id. (quotation omitted).  Indeed, as a subdivision of the state, the City of Laconia may exercise such powers as are expressly or impliedly granted to it by the legislature.  See Dover News, Inc. v. City of Dover, 117 N.H. 1066, 1068 (1977).

Although there exists no express authority for a city to enact an ordinance prohibiting females from exposing their nipples, RSA 47:17, VII (2012) grants the city the power "[t]o regulate all streets and public ways, wharves, docks, and squares, and the use thereof."  Further, RSA 47:17, XIII

---

[4] RSA 132:10-d (2015) provides: "Breast-feeding a child does not constitute an act of indecent exposure and to restrict or limit the right of a mother to breast-feed her child is discriminatory."  Although noting that the ordinance does not make any exception for breast-feeding, the defendants specifically acknowledge that "they are not seeking to invalidate the ordinance for its failure to exempt breastfeeding."  We therefore have no occasion to address this issue.

14

(2012) grants the city the power "to regulate the times and places of bathing and swimming in the canals, rivers and other waters of the city, and the clothing to be worn by bathers and swimmers." In addition, RSA 47:17, XV (2012) gives the city the power to "make any other bylaws and regulations which may seem for the well-being of the city" so long as "no bylaw or ordinance" is "repugnant to the constitution or laws of the state."

Moreover, the governmental authority known as the police power is an inherent attribute of state sovereignty. Piper v. Meredith, 110 N.H. 291, 294 (1970). The police power is broad and "includes such varied interests as public health, safety, morals, comfort, the protection of prosperity, and the general welfare." Id. (quotation omitted). The express and implied powers granted to towns by the legislature must be interpreted and construed in light of the police powers of the state which grants them. Id. at 295.

We have held that towns are empowered under the authority granted by RSA 31:39 (Supp. 2017) to make bylaws for a variety of purposes which generally fall into the category of health, welfare, and public safety. See id. Specifically, RSA 31:39, I(a) empowers towns to make bylaws for "[t]he care, protection, preservation and use of the public cemeteries, parks, commons, libraries and other public institutions of the town."

We believe that these statutory provisions authorize the city to enact the ordinance. See Dover News, Inc., 117 N.H. at 1068. As we explained, the stated purpose of the ordinance is to uphold and support "public health, public safety, morals and public order." Laconia, N.H., Code of Ordinances ch. 180, art. 1, § 180-1. We agree with the State that the ordinance's prohibition on public nudity is substantially related to this purpose. See Grant, 107 N.H. at 3. Furthermore, we have found that the ordinance does not violate the defendants' constitutional rights to equal protection or freedom of speech under the State and Federal Constitutions. As such, it does not unduly restrict the defendants' fundamental rights. Accordingly, we agree with the trial court that the City had the authority to enact the ordinance.

V.      Preemption

The defendants next contend that the ordinance is preempted by RSA 645:1, I (2016). It is well settled that towns cannot regulate a field that has been preempted by the State. Town of Rye Bd. of Selectmen v. Town of Rye Zoning Bd. of Adjustment, 155 N.H. 622, 624 (2007). The preemption doctrine flows from the principle that municipal legislation is invalid if it is repugnant to, or inconsistent with, state law. Id. State law expressly preempts local law when there is an actual conflict between state and local regulation. Id. at 624-25. An actual conflict exists when a municipal ordinance or regulation permits that which a state statute prohibits, or vice versa. Id. at 625. Moreover, even when a local ordinance does not expressly conflict with a state statute, it will

be preempted when it frustrates the statute's purpose. Forster v. Town of Henniker, 167 N.H. 745, 756 (2015). Because preemption "is essentially a matter of statutory interpretation and construction," whether a state statute preempts local regulation is a question of law, which we review de novo. Id. (quotation omitted).

RSA 645:1, I, provides that "[a] person is guilty of a misdemeanor if such person fornicates, exposes his or her genitals, or performs any other act of gross lewdness under circumstances which he or she should know will likely cause affront or alarm." The defendants do not — and could not — argue that this statute specifically authorizes the public display of breasts by females. On the contrary, although we need not decide the issue, this statute at least arguably can be read to prohibit such conduct as an act of gross lewdness. See, e.g., Com. v. Quinn, 789 N.E.2d 138, 146 (Mass. 2003). Nor can it be said that this statute represents the kind of comprehensive regulatory scheme that is indicative of legislative intent to occupy the field of regulation of public safety and morals. See Prolerized New England Co. v. City of Manchester, 166 N.H. 617, 623 (2014). Therefore, there is simply no basis for a claim that the ordinance either expressly conflicts with RSA 645:1, I, or that it frustrates the purpose of the statute.

The defendants point to an unsuccessful effort by legislators to enact legislation that would have specifically prohibited the public exposure of female breasts, see 2016 HB 1525-FN, arguing that the failure of that measure demonstrates legislative intent not to prohibit such conduct. As we have noted, however, "[w]e can discern no clear meaning from the legislature's failure to enact the proposed amendment." Dover News, Inc., 117 N.H. at 1069; see also Appeal of House Legislative Facilities Subcom., 141 N.H. 443, 449 (1996) (rejecting as misguided argument that failure of proposed amendment to Public Employee Labor Relations Act that would have expressly excluded legislative and judicial employees from its coverage demonstrated legislative intent that such employees be covered, and observing that "the amendment's failure could as easily have resulted from the belief that those employees were not covered by the Act in the first place").

For these reasons, we find that the ordinance is not preempted by RSA 645:1, I.

VI.    RSA Chapter 354-A

Finally, the defendants argue that the trial court erred by denying their motion to dismiss because the ordinance violates RSA chapter 354-A. Relying upon RSA 354-A:16 and :17, the defendants contend that by "mak[ing] it illegal to be a topless female in public while allowing a male to be topless in public," the ordinance discriminates by "exclud[ing] someone from being on public property based solely on that person's sex/gender."

16

This argument requires us to engage in statutory interpretation.  We are the final arbiters of the legislature's intent as expressed in the words of the statute considered as a whole.  EEOC v. Fred Fuller Oil Co., 168 N.H. 606, 608 (2016).  "We first examine the language of the statute, and, when possible, we ascribe the plain and ordinary meanings to the words used."  Eldridge v. Rolling Green at Whip-Poor-Will Condo. Owners' Association, 168 N.H. 87, 90 (2015) (quotation omitted).

RSA chapter 354-A, known as the "Law Against Discrimination," prohibits, as relevant here, unlawful discrimination based upon sex in places of public accommodation as provided therein.  See RSA 354-A:1 (title and purposes of chapter), :16-:17 (public accommodation).  RSA 354-A:16 provides, in pertinent part, that "[t]he opportunity for every individual to have equal access to places of public accommodation without discrimination because of age, sex, race, creed, color, marital status, physical or mental disability or national origin is hereby recognized and declared to be a civil right."  RSA 354-A:17 states:

> It shall be an unlawful discriminatory practice for any person, being the owner, lessee, proprietor, manager, superintendent, agent or employee of any place of public accommodation, because of the . . . sex . . . of any person, directly or indirectly, to refuse, withhold from or deny to such person any of the accommodations, advantages, facilities or privileges thereof; or, directly or indirectly, to publish, circulate, issue, display, post or mail any written or printed communication, notice or advertisement to the effect that any of the accommodations, advantages, facilities and privileges of any such place shall be refused, withheld from or denied to any person on account of . . . sex . . . ; or that the patronage or custom thereat of any person belonging to or purporting to be of any particular . . . sex . . . is unwelcome, objectionable or acceptable, desired or solicited.

In advancing their statutory argument, the defendants do little more than rehash their constitutional equal protection argument that, by prohibiting the exposure of the female, but not the male, breast, the ordinance discriminates on the basis of sex.  For the reasons already discussed, we do not find that the ordinance constitutes unlawful discrimination in violation of RSA 354-A:16 or :17.  Rather, we agree with the trial court that the ordinance merely prohibits those who access public places from doing so in the nude, and makes a permissible distinction between the areas of the body that must be covered by each gender.[5]  See Sachs, 92 P.3d at 29 (holding that, in addition to

_____

[5] The defendants cite cases from several jurisdictions that hold that various forms of preferences given to women, such as car wash discounts and discounted drink prices for women at a bar or racetrack, violated the respective jurisdiction's anti-discrimination laws or ordinances.  See Koire

not violating the New Mexico Constitution, the ordinance at issue in that case did not contravene the New Mexico Human Rights Act).

Affirmed.

LYNN, C.J., and DONOVAN, J., concurred; BASSETT, J., with whom HICKS, J., joined, concurred in part and dissented in part.

BASSETT, J., with whom HICKS, J., joins, concurring in part and dissenting in part. We agree with our colleagues in most respects: Laconia's ordinance does not violate the defendants' rights to freedom of speech and expression; it falls within the regulatory authority of the City of Laconia; it is not preempted by statute; and it does not violate RSA chapter 354-A. However, we part company with the majority when it rejects the defendants' equal protection claim. We strongly disagree that rational basis is the lens through which the defendants' equal protection challenge should be analyzed. Laconia's ordinance facially classifies on the basis of gender: if a woman and a man wear the exact same clothing on the beach, on Laconia's main street, or in a backyard "visible to the public," the woman is engaging in unlawful behavior — but the man is not. Laconia, N.H., Code of Ordinances ch. 180, art. I, §§ 180-2, 180-4 (1998). This is a gender-based classification. Accordingly, the court must apply strict scrutiny. See In re Sandra H., 150 N.H. 634, 637 (2004) ("Classifications based upon suspect classes or affecting a fundamental right are subject to the most exacting scrutiny . . . ." (quotation omitted)); Cheshire Medical Center v. Holbrook, 140 N.H. 187, 189 (1995) ("Our constitution guarantees that 'equality of rights . . . shall not be denied or abridged by this state on account of . . . sex.' N.H. CONST. pt. I, art. 2. In order to withstand scrutiny under this provision, a common law rule that distributes benefits or burdens on the basis of gender must be necessary to serve a compelling State interest."); LeClair v. LeClair, 137 N.H. 213, 222 (1993) ("We apply the strict scrutiny test, in which the government must show a compelling State interest in order for its actions to be valid, when the classification involves a suspect class based on race, creed, color, gender, national origin, or legitimacy . . . ." (quotation omitted) (superseded by statute on other grounds). Were this court to subject Laconia's ordinance to this exacting standard, given that the government failed to present sufficient evidence in the trial court to satisfy its burden of proof, we would be compelled to find the ordinance unconstitutional.

---

v. Metro Car Wash, 707 P.2d 195, 204 (Cal. 1985); City of Clearwater v. Studebaker's D. Cl., 516 So. 2d 1106, 1108-09 (Fla. Dist. Ct. App. 1987); Ladd v. Iowa West Racing Ass'n., 438 N.W.2d 600, 602 (Iowa 1989); Peppin v. Woodside Delicatessen, 506 A.2d 263, 267 (Md. Ct. Spec. App. 1986); Com., Pa. Liquor Control Bd. v. Dobrinoff, 471 A.2d 941, 943 (Pa. Commw. Ct. 1984). These cases are readily distinguishable from the case at bar because, unlike in this case, they did not involve a distinction based upon the common understanding of what constitutes nudity.

Laconia's ordinance makes it "unlawful for any person to knowingly or intentionally, in a public place: . . . [a]ppear in a state of nudity." Laconia, N.H., Code of Ordinances ch. 180, art. I, § 180-2. Laconia defines "public place" to include "[a]ny public street, . . . beach, or other property or public institution of the City"; "[a]ny outdoor location, whether publically or privately owned, which is visible to the public at the time the prohibited conduct occurs"; and "[a]ny area within any . . . place of public accommodation or other private property which is generally frequented by the public." Laconia, N.H., Code of Ordinances ch. 180, art. I § 180-4. It defines nudity as "the showing of the human male or female genitals, pubic area or buttocks with less than a fully opaque covering, or the showing of the female breast with less than a fully opaque covering of any part of the nipple." Id. The defendants argue that the latter portion of the ordinance violates their constitutional rights to equal protection because, even though both men and women have nipples, the ordinance does not treat men and women equally.

"In considering an equal protection challenge under our State Constitution, we must first determine the correct standard of review by examining the purpose and scope of the State-created classification and the individual rights affected." Cmty. Res. for Justice v. City of Manchester, 154 N.H. 748, 758 (2007) (quotation and brackets omitted). The significance of the threshold determination as to the proper standard of review cannot be overstated. Classifications based upon suspect classes or that affect fundamental rights are subject to strict scrutiny: the government must prove that the legislation is "necessary to serve a compelling State interest," Holbrook, 140 N.H. at 189, and that it is "narrowly tailored to meet that end," Cmty. Res., 154 N.H. at 759 (quotation omitted). Below strict scrutiny is intermediate scrutiny, which is triggered when the challenged classification involves important substantive rights, Sandra H., 150 N.H. at 637-38, and which requires the government to show that the challenged legislation is substantially related to an important government interest. Cmty. Res., 154 N.H. at 762. Under either strict or intermediate scrutiny, the government bears the burden of proof, and "may not rely upon justifications that are hypothesized or invented post hoc in response to litigation, nor upon overbroad generalizations." Id. (quotations omitted); see also Fisher v. University of Texas at Austin, 570 U.S. 297, 310-12 (2013). On the other end of the spectrum, if legislation does not classify based on a suspect class, affect fundamental rights, or involve important substantive rights, the constitutional standard of review is rational basis. Sandra H., 150 N.H. at 638. "The rational basis test under the State Constitution requires that legislation be only rationally related to a legitimate government interest." Boulders at Strafford v. Town of Strafford, 153 N.H. 633, 641 (2006). The rational basis test puts the burden of proof on the party challenging the legislation and "contains no inquiry into whether legislation unduly restricts individual rights." Id. at 641-42.

The majority acknowledges — as it must — that under the New Hampshire Constitution, gender-based classifications trigger strict scrutiny. Yet the majority declines to apply strict scrutiny in this case, reasoning that, because "men and women are not fungible with respect to the traditional understanding of what constitutes nudity," the Laconia ordinance does not classify on the basis of gender. The conclusion that the ordinance does not classify on the basis of gender, and therefore can be analyzed by applying the rational basis test, does not find support in the plain language of the ordinance, the New Hampshire Constitution, or our precedent.

That the ordinance classifies on the basis of gender is self-evident. The ordinance defines "nudity" differently for females and males. By the plain text of the ordinance, a person who appears in a public place showing "the <u>female</u> breast with less than a fully opaque covering of any part of the nipple" violates the ordinance; a male who appears in the same public place without such a covering does not. <u>Laconia, N.H., Code of Ordinances</u> ch. 180, art. I, §§ 180-2, 180-4 (emphasis added). The challenged portion of the ordinance creates a public dress code which only one gender can violate. This is a gender-based classification.

Indeed, the Seventh Circuit Court of Appeals recently held that a public nudity ordinance that defines nudity differently for men and women classifies on the basis of gender. <u>Tagami v. City of Chicago</u>, 875 F.3d 375, 379-80 (7th Cir. 2017), <u>cert. denied</u>, 138 S. Ct. 1577 (2018). In <u>Tagami</u>, a woman who had been found guilty of violating a public-nudity ordinance that criminalized public display of "the breast at or below the upper edge of the areola thereof of any female person" if "not covered by an opaque covering," sued the City alleging that the ordinance discriminates on the basis of sex in violation of the Federal Constitution. <u>Id</u>. at 377 (quotation omitted). The City asserted that the ordinance did not classify on the basis of sex because it "treats men and women alike by equally prohibiting the public exposure of the male and female body parts that are conventionally considered to be intimate, erogenous, and private." <u>Id</u>. at 379-80. The City contended that "the list of intimate body parts is longer for women than men, but that's wholly attributable to the basic physiological differences between the sexes." <u>Id</u>. at 380. The Seventh Circuit summarily dismissed the City's contention, stating that the City's argument was "a justification for this classification rather than an argument that no sex-based classification is at work here at all." <u>Id</u>. The court concluded that, "[o]n its face, the ordinance plainly <u>does</u> impose different rules for women and men," and then proceeded to analyze the ordinance under the heightened scrutiny required by the Federal Constitution for gender-based classifications. <u>Id</u>.

The Seventh Circuit is not an outlier. Many courts have held that ordinances such as Laconia's do, in fact, classify on the basis of gender. <u>See, e.g.</u>, <u>Craft v. Hodel</u>, 683 F. Supp. 289, 299 (D. Mass. 1988) (concluding that, under the Federal Constitution, a regulation prohibiting display of female but

20

not male breasts "does, of course, distinguish between males and females" and thus was "subject to scrutiny under the Equal Protection Clause" (quotation omitted)); City of Tucson v. Wolfe, 917 P.2d 706, 707 (Ariz. Ct. App. 1995) (applying heightened scrutiny "[b]ecause this ordinance creates a different standard of conduct for each gender"); Dydyn v. Department of Liquor Control, 531 A.2d 170, 175 (Conn. App. Ct. 1987) ("We are not persuaded, however, by the argument that the regulation does not classify on the basis of sex. When a statute or regulation distinguishes between male and female anatomy, we hold that [the level of scrutiny required for gender-based classifications] must be applied."). But see Eckl v. Davis, 124 Cal. Rptr. 685, 695-96 (Ct. App. 1975) (holding that the ordinance did not classify based on sex because "nudity in the case of women is commonly understood to include the uncovering of the breast"); City of Seattle v. Buchanan, 584 P.2d 918, 920-22 (Wash. 1978) (en banc) (same).

We agree with the reasoning of the Seventh Circuit. Public nudity ordinances such as the ordinances in Chicago and Laconia — i.e., those that use explicit, gendered language to make it unlawful for a female to engage in certain behavior, while the same behavior is lawful for a male — clearly classify by gender. The majority asserts that such reasoning is "flawed" and "deceptively simple." We fail to see the flaw or deception in our simple reasoning: when a law uses the word "female" to classify between those who can violate the ordinance — females — and those who cannot — males — it contains a gender-based classification. We freely acknowledge that the question of whether basic physiological differences between the sexes justify disparate treatment of men and women is a more nuanced and complicated question. But classification and justification present different questions. Respectfully, we find the reasoning of the majority — which obscures the simple threshold question — needlessly convoluted and artificially complex.

Indeed, a court upends the safeguards of equal protection if it reasons that, because a law is premised upon physiological or anatomical differences between the sexes, the law does not classify by gender and therefore it need not be analyzed under strict scrutiny. For example, because women have a longer life expectancy than men, by the majority's reasoning, a hypothetical law that mandates that women work four years longer than men in order to qualify for a pension, or prevents women from retiring until age 70 as opposed to age 66 for men, or reduces a woman's social security benefits if she retires at the same age as a man, does not classify on the basis of gender. Such a law would be constitutional so long as it was "rationally related to a legitimate government interest." Boulders, 153 N.H. at 641. Analyzing whether a law comports with equal protection does not require that the court be blind to basic physiological or anatomical differences. In some cases, applying the constitutionally required level of scrutiny, this court might conclude that such differences justify disparate treatment under the law. However, a court subverts the basic guarantee of equal protection if it concludes that, because men and women

21

have physiological or anatomical differences, a law that classifies on the basis of those differences does not trigger strict scrutiny.

The New Hampshire Constitution states: "Equality of rights under the law shall not be denied or abridged by this state on account of race, creed, color, sex or national origin." N.H. CONST. pt. I, art. 2. This guarantee became part of our State Constitution in 1974 after the people of New Hampshire passed the Equal Rights Amendment by an overwhelming margin. There is no counterpart to New Hampshire's Equal Rights Amendment in the United States Constitution. Accordingly, we, like courts in other states whose citizens have adopted an Equal Rights Amendment, do not "equate our [Equal Rights Amendment] with the equal protection clause of the federal constitution" as doing so "would negate its meaning given that our state adopted an [Equal Rights Amendment] while the federal government failed to do so." Doe v. Maher, 515 A.2d 134, 160-61 (Conn. Super. Ct. 1986). We "find inescapable the conclusion that [our Equal Rights Amendment] was intended to supplement and expand the guaranties of the equal protection provision . . . and requires us to hold that a classification based on sex is a 'suspect classification' which, to be held valid, must withstand 'strict judicial scrutiny.'" People v. Ellis, 311 N.E.2d 98, 101 (Ill. 1974). "Any other view would mean the people intended to accomplish no change in the existing constitutional law governing sex discrimination" when they enacted the amendment. Darrin v. Gould, 540 P.2d 882, 889 (Wash. 1975) (en banc). Our amended Constitution, and subsequent precedent, now require the State to bear a heavy burden when it seeks to treat people differently under the law "on account of race, creed, color, sex or national origin." N.H. CONST. pt. I, art. 2; see, e.g., Sandra H., 150 N.H. at 637; Holbrook, 140 N.H. at 189; LeClair, 137 N.H. at 222. As we have previously observed:

> Part I, article 2 of the New Hampshire Constitution forbids the State to discriminate on the basis of . . . gender. The New Hampshire voters, in ratifying this amendment, have firmly established public policy that demands equal protection for all, regardless of . . . gender.

In re Certain Scholarship Funds, 133 N.H. 227, 232 (1990).

The majority's conclusion that a lesser standard applies turns the clock back to the era before the adoption of the Equal Rights Amendment — a bygone era when women were the victims of pervasive discrimination and this court rejected challenges to laws that treated men and women differently. Indeed, the New Hampshire Supreme Court held more than sixty years ago — but within the lifetimes of judges now sitting on this court — that a regulation which banned women from playing golf on a municipal course during certain hours did not violate the New Hampshire Constitution's equal protection guarantee. See Allen v. Manchester, 99 N.H. 388, 390-92 (1955). We reasoned

22

that because it was not "plainly mistaken or arbitrary" that "women golfers, on the average, progress about the course more slowly than men," and separating slow groups from fast groups might improve "the safety of players, and of women and children golfers in particular," the law did not create an "invalid classification." Id. at 391-92. "Women were separately classified with children, not because of sex, but because of a manner of playing golf thought to be characteristic of them as a group." Id. at 392. The majority's position in this case — that strict scrutiny is not required here because women are thought to be different from men with regard to nudity — harkens back to that bygone era.

The majority misconstrues the equal protection guarantee when it reasons that our precedent "does not necessarily establish that the Laconia ordinance triggers strict scrutiny" because it "does not address the type of legislation that is at issue here: a proscription that imposes requirements on both men and women, but applies to women somewhat differently." The threshold inquiry as to the proper level of review is not whether the law classifies by gender in all respects: it is whether the law classifies by gender in any respect. As the United States Supreme Court has explained: "Whenever the government treats any person unequally because of [a suspect classification], that person has suffered an injury that falls squarely within the language and spirit of the Constitution's guarantee of equal protection." Adarand Constructors, Inc. v. Pena, 515 U.S. 200, 229-30 (1995). It is precisely because Laconia's ordinance "applies to women somewhat differently" that we must apply strict scrutiny.

The majority reasons that a lesser standard is applicable here in part because "[c]ourts in other jurisdictions have generally upheld laws that prohibit women but not men from exposing their breasts," but have "often left unclear the applicable standard of review." It observes that no court has held that an ordinance like Laconia's triggers strict scrutiny, and that no appellate court has held such an ordinance unconstitutional. However, "[t]he New Hampshire Constitution is the fundamental charter of our State." State v. Ball, 124 N.H. 226, 231 (1983). "Our constitution will often afford greater protection against the action of the State than does the Federal Constitution." State v. Settle, 122 N.H. 214, 217 (1982). Therefore, "this court has a responsibility to make an independent determination of the protections afforded under the New Hampshire Constitution." Ball, 124 N.H. at 231. "If we ignore this duty, we fail to live up to our oath to defend our constitution . . . ." Id.

We recognize that courts in other jurisdictions, applying less exacting levels of scrutiny, have upheld the constitutionality of ordinances similar to Laconia's. See, e.g., Tagami, 875 F.3d at 380. But see Free the Nipple Fort Collins v. City of Fort Collins, Colorado, 237 F. Supp. 3d 1126, 1130, 1133 (D. Colo. 2017) (concluding that equal protection challenge to ordinance prohibiting women but not men from exposing their breasts was likely to

23

succeed on the merits when analyzed under intermediate scrutiny, as required by the Federal Constitution, because the ordinance "is based on an impermissible gender stereotype that results in a form of gender-based discrimination"). However the Federal Constitution, and the majority of other state constitutions, materially differ from New Hampshire's Constitution because they do not explicitly provide that equal rights under the law shall not be denied because of sex. See Leslie W. Gladstone, Cong. Research Serv., RS20217, Equal Rights Amendments: State Provisions (2004) (discussing and listing state Equal Rights Amendments). In those jurisdictions, gender-based classifications never trigger strict scrutiny review. See, e.g., Tagami, 875 F.3d at 380 (Federal Constitution); Wolfe, 917 P.2d at 707 (state constitution). By contrast, in New Hampshire, gender-based classifications always trigger strict scrutiny review. Therefore, to the extent that the majority relies upon the outcome of cases decided through application of less rigorous standards to determine the issue central to this case — whether Laconia's ordinance contains a gender-based classification — it shrinks from the court's duty to ensure that "Equality of rights under the law shall not be denied or abridged by this state on account of race, creed, color, sex or national origin." N.H. CONST. pt. I, art. 2.

For the reasons discussed above, we conclude that Laconia's ordinance classifies on the basis of gender. We recognize that a handful of courts, including two sitting in states that have adopted equal rights provisions similar to Part I, Article 2, have concluded that ordinances like Laconia's do not classify on the basis of gender. See Eckl, 124 Cal. Rptr. at 696; Buchanan, 584 P.2d at 920-22. However, the reasoning employed by these courts is unsound and cannot withstand scrutiny.

In Eckl, the California Court of Appeal reasoned that a public nudity ordinance that defined nudity differently for men and women did not contain a gender-based classification because "[n]ature, not the legislative body, created the distinction between that portion of the woman's body and that of a man's torso," Eckl, 124 Cal. Rptr. at 696; see also Buchanan, 584 P.2d at 920 ("[C]ommon knowledge tells us . . . that there is a real difference between the sexes with respect to breasts . . . ."). However, the fact that "nature" has created distinctions between men and women does not lessen the level of scrutiny demanded by our constitution. Our precedent is clear: in order to "determine the correct standard of review," the court must "examin[e] the purpose and scope of the State-created classification and the individual rights affected." Cmty. Res., 154 N.H. at 758 (quotations and brackets omitted). The critical threshold determination as to the proper standard of review should not — and does not — include a judicial inquiry into whether "nature" or "the legislative body" created distinctions among those classified.

24

Indeed, "natural" distinctions between people — including differences in skin color, gender, and country of origin — have historically served as justifications for pervasive and perverse discrimination. That is precisely why the constitution requires us to subject legislation that distinguishes between people on the basis of such differences to heightened scrutiny. The "basic concept of our system [is] that legal burdens should bear some relationship to individual responsibility." Frontiero v. Richardson, 411 U.S. 677, 686 (1973) (plurality opinion) (quotation omitted). Gender, skin color, and country of origin are "immutable facts that bear no relation to ability, disadvantage, moral culpability, or any other characteristics of constitutionally permissible interest to government." Fullilove v. Klutznick, 448 U.S. 448, 525 (1980) (Stewart, J., dissenting); see also Frontiero, 411 U.S. at 686. Accordingly, when a legislative body enacts a law that distributes benefits or burdens on the basis of any of these immutable characteristics, that legislation triggers strict scrutiny review. See Holbrook, 140 N.H. at 189. The Equal Rights Amendment was intended as a shield to protect people from disparate treatment under the law on the basis of "natural" or immutable characteristics. But here the majority concludes that because "nature, not the legislative body," has distinguished between men and women, Laconia's ordinance does not classify on the basis of gender. In so doing, the majority turns a constitutional shield into a sword: it wields "immutable characteristics" as a weapon to attack the very protections that the Equal Rights Amendment was intended to guarantee.

Perhaps recognizing this truth, the majority, quoting Buchanan and Eckl, attempts to further justify its conclusion by asserting that the ordinance "merely reflects the fact that men and women are not fungible with respect to the traditional understanding of what constitutes nudity." Buchanan, 584 P.2d at 920-22 ("It is true that [the ordinance] requires the draping of more parts of the female body than of the male, but only because there are more parts of the female body intimately associated with the procreative function. The fact that the ordinance takes account of this fact does not render it discriminatory."); Eckl, 124 Cal. Rptr. at 696 ("Unlike the situation with respect to men, nudity in the case of women is commonly understood to include the uncovering of the breasts. Consequently, in proscribing nudity on the part of women it was necessary to include express reference to that area of the body."). However, "traditional" or "common" moral understandings do not determine constitutional guarantees.

"[O]ur Nation has had a long and unfortunate history of sex discrimination." Frontiero, 411 U.S. at 684. "Traditionally, such discrimination was rationalized by an attitude of 'romantic paternalism' which, in practical effect, put women, not on a pedestal, but in a cage." Id. The law no longer accepts stereotypical notions about women's abilities, interests, and proper place in the public sphere as justifications to treat men and women differently under the law with regard to their ability to serve on juries, see J.E.B. v. Alabama ex rel. T.B., 511 U.S. 127, 130-31 (1994), administer estates,

25

see Reed v. Reed, 404 U.S. 71, 76 (1971), or learn as military cadets, see United States v. Virginia, 518 U.S. 515, 557-58 (1996).  A court would no longer say, as a Supreme Court Justice did over 100 years ago, that a woman did not have a right to practice law because "the civil law, as well as nature herself, has always recognized a wide difference in the respective spheres and destinies of man and woman. . . .  This is the law of the Creator. . . .  [T]he rules of civil society must be adapted to the general constitution of things . . . ." Bradwell v. The State, 83 U.S. 130, 141-42 (1872) (Bradley, J., concurring). We revisit that bygone era, and thwart the very protections the Equal Rights Amendment was enacted to provide, if we allow stereotypical notions about women's bodies to alter our analysis of the straightforward question of whether Laconia's ordinance classifies on the basis of gender.  This is precisely why the New Hampshire Constitution requires that legislation which discriminates on the basis of a suspect classification be subject to strict scrutiny.

The law has often been used to perpetuate discrimination based on "public sensibilities" or "common understandings" about individuals on the basis of immutable characteristics — however misinformed or ill-motivated those understandings might be.  "One of the most important purposes to be served by the Equal Protection Clause is to ensure that 'public sensibilities' grounded in prejudice and unexamined stereotypes do not become enshrined as part of the official policy of government."  People v. Santorelli, 600 N.E.2d 232, 236 (N.Y. 1992) (Titone, J., concurring).  "Thus, where 'public sensibilities' constitute the justification for a gender-based classification, the fundamental question is whether the particular 'sensibility' to be protected is, in fact, a reflection of archaic prejudice or a manifestation of a legitimate government objective."  Id.  When the majority takes judicial notice of a common moral understanding about an immutable physical characteristic, and allows it to alter and lessen a constitutional guarantee, it erodes the protections the Equal Rights Amendment was enacted to provide.  We see no principled reason why the majority's approach would not apply with equal force to other laws that treat people differently "on account of race, creed, color, sex or national origin." N.H. CONST. pt. I, art. 2.  This is a significant change to New Hampshire's equal protection guarantee that gives us great pause.  As the United States Supreme Court has observed:

> The point of carefully examining the interest asserted by the government in support of a [suspect] classification, and the evidence offered to show that the classification is needed, is precisely to distinguish legitimate from illegitimate uses of [immutable characteristics] in governmental decisionmaking. . . . [The fact that] some cases may be difficult to classify [is] all the more reason, in our view, to examine [suspect] classifications carefully. . . .  By requiring strict scrutiny of [suspect] classifications, we require courts to make sure that a governmental

26

classification based on [a suspect class] . . . is legitimate, before permitting unequal treatment . . . to proceed.

Adarand, 515 U.S. at 228 (quotation omitted).

We now analyze Laconia's ordinance under the applicable standard of review, strict scrutiny, to determine whether the State adduced sufficient evidence to meet its exacting burden. We have no choice but to conclude that it did not. During the hearing on the petitioners' motion to dismiss, the State argued that equal protection is not strictly applicable to this case, and that "the burden is on the petitioner to show that [the ordinance] is unconstitutional. . . . It's not on the State." In light of the State's position that the ordinance does not trigger strict scrutiny, it is not surprising that the State failed to introduce sufficient evidence to support a finding that the ordinance is "necessary to serve a compelling State interest," Holbrook, 140 N.H. at 189, or that it is "narrowly tailored to meet that end." Cmty. Res., 154 N.H. at 759 (quotation omitted).

The ordinance's stated purpose is to uphold and support "public health, public safety, morals and public order." Laconia, N.H., Code of Ordinances ch. 180, art. I, § 180-1 (1998). In the trial court, the City asserted that because the defendants were topless, they caused a "disturbance" which "has the potential for violence." The City also asserted that, because people think of "female breasts in a sexualized manner," topless women may present other beachgoers with "a mental health issue." Turning to the ordinance's other stated purposes, "morals and public order," the City argued to the trial court that women who do not cover their nipples act contrary to "the City's character" and "morals as determined by the city council."

However we, like the United States Supreme Court, "have never held that moral disapproval, without any other asserted state interest, is a sufficient rationale under the Equal Protection Clause to justify a law that discriminates among groups of persons." Lawrence v. Texas, 539 U.S. 558, 582 (2003) (O'Connor, J., concurring in the judgment). Indeed, the State has not cited — nor are we aware of — any case that holds that a government's interest in morality rises to the level of a compelling government interest. "[T]he fact that the governing majority in a State has traditionally viewed a particular practice as immoral is not a sufficient reason for upholding a law prohibiting the practice." Id. at 577 (quotation omitted) (majority opinion). Accordingly, we do not conclude that the State has met its burden of proving that the government's interests in morals and public order are, in fact, compelling. "Our obligation is to define the liberty of all, not to mandate our own moral code." Planned Parenthood of Southern PA v. Casey, 505 U.S. 833, 850 (1992).

Even if we assume that the government's asserted interests are compelling, a review of the evidence presented to the trial court establishes

27

that the State has not met its burden to prove that the ordinance is necessary and narrowly tailored.  See Holbrook, 140 N.H. at 189; Cmty. Res., 154 N.H. at 759.  "Although narrow tailoring does not require exhaustion of every conceivable [gender]-neutral alternative, . . . [t]he reviewing court must ultimately be satisfied that no workable [gender]-neutral alternatives" would suffice.  Fisher, 570 U.S. at 312 (quotation, citation, and brackets omitted).  Here, there is no evidence that the City of Laconia considered gender-neutral alternatives and the State has made no argument and presented no evidence as to why gender-neutral alternatives would not suffice.  At oral argument the State asserted that the ordinance was "fairly narrowly tailored" because a woman need only "wear pasties" including "pasties that look like nipples."  However, it failed to explain why the ordinance was necessary in the first place or why a less restrictive ordinance, perhaps one more narrow in time or place, would be insufficient.  By the ordinance's plain language, it is perfectly lawful for a post-pubescent female to wear pasties with tassels walking down Laconia's Main Street, even though a four-year-old girl playing on the beach wearing only shorts, or an adult woman sunbathing without a top in her own back yard, engages in unlawful behavior if her nipples are "visible to the public."  Laconia, N.H., Code of Ordinances ch. 180, art. I, § 180-4.  Without evidence that gender-neutral or less restrictive alternatives would be unworkable, we cannot conclude that the State has met its burden to prove that Laconia's ordinance is necessary and narrowly tailored to accomplish the government's asserted interests.

In sum, applying the strict scrutiny standard required by Part I, Article 2, we conclude that the State has not carried its burden to prove that its asserted interests are compelling and that Laconia's ordinance is necessary and narrowly tailored.  We reach this conclusion after objectively applying strict scrutiny as required by our precedent and Part I, Article 2.  In so concluding, we do not mean to imply that all legislation that classifies on the basis of gender would not survive the strict scrutiny test, nor that Laconia's ordinance might not have passed constitutional muster had the State accepted that it bore the burden of proof; rather, we find that the State's proof in this case falls far short of satisfying strict scrutiny.

Although laws that classify on the basis of gender are subject to strict scrutiny under the New Hampshire Constitution, it does not follow that all such laws will be invalidated by application of that exacting standard.  "The fact that strict scrutiny applies says nothing about the ultimate validity of any particular law; that determination is the job of the court applying strict scrutiny."  Johnson v. California, 543 U.S. 499, 515 (2005) (quotation omitted).  Therefore, if the State meets its burden to demonstrate that a law that classifies on the basis of gender is necessary and narrowly tailored to further a compelling government interest, this court would find — as have others — that such a law is constitutional.  See People v. Carranza, No. B240799, 2013 WL 3866506, at *7-8 (Cal. Ct. App. July 24, 2013) (concluding that a sexual

28

battery statute which criminalized non-consensual touching of the breast of a female, but not of a male, did not violate the state's constitutional equal protection guarantee when analyzed under strict scrutiny because "there is a compelling government interest in protecting females from non-consensual touching of their breasts"); Michael M. v. Superior Court of Sonoma Cty., 601 P.2d 572, 573-74 (Cal. 1979) (en banc), aff'd, 450 U.S. 464 (1981) (applying strict scrutiny and holding that a statute which criminalized sexual intercourse with a minor female, but not a male, classified by sex but did not violate equal protection because the law was "supported not by mere social convention but by the immutable physiological fact that it is the female exclusively who can become pregnant," and the State had a "compelling . . . interest in minimizing both the number of [teen] pregnancies and their disastrous consequences").

Finally, the majority concludes its equal protection analysis by stating that we as a court should not allow any feelings we may have as judges about the ordinance to "lead us to forget our constitutional role" because "'[o]ur obligation' is to interpret and apply the law, 'not to mandate our own moral code.'" (Quoting Casey, 505 U.S. at 850.)  The suggestion is that we, as judges, should interpret and apply the constitution as it exists, not as we think it ought to exist.  On this point, we agree.  However, the constitution — as it has existed for the past 45 years — includes an Equal Rights Amendment: "Equality of rights under the law shall not be denied or abridged by this state on account of race, creed, color, sex or national origin."  N.H. CONST. pt. I, art. 2.  Surely the citizens thought they were accomplishing something important when they changed the constitution.  Our "constitutional role" is, therefore, to interpret and apply Part I, Article 2.

In service of that role, over four decades, we have fashioned an analytical framework which subjects laws that distinguish on the basis of gender to the highest level of constitutional scrutiny: strict scrutiny.  See Holbrook, 140 N.H. at 189; Sandra H., 150 N.H. at 637; LeClair, 137 N.H. at 222.  However, perhaps mindful of the State's obvious failure to present evidence sufficient to meet the exacting burden of strict scrutiny in this case, the majority strains to conclude that an ordinance that prohibits women — but not men — from engaging in certain behavior does not discriminate on the basis of sex, but is, in fact, gender-neutral.  Such an approach is not in service of our constitutional role: it is an abdication of it.  Based upon the record before us, we conclude that Laconia's ordinance violates Part I, Article 2 of the New Hampshire Constitution.  We respectfully dissent.